483 So.2d 564 (1986)
STATE of Louisiana
v.
Edward R. BYRNE, Jr.
No. 85-KA-0877.
Supreme Court of Louisiana.
January 13, 1986.
Rehearing Denied March 7, 1986.
*566 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Henry N. Brown, Jr., Dist. Atty., for plaintiff-appellee.
M. Randal Fish, Bossier City, Ford E. Stinson, Jr., Indigent Defender Office, Benton, for defendant-appellant.
BLANCHE, Justice.
Shortly after 2:00 p.m. on August 14, 1984, the body of Roberta Johnson was discovered in the locked office of a Bossier City gas station. Three weeks later the grand jury of Bossier Parish returned a true bill indicting Edward R. Byrne, Jr. for first degree murder in violation of La.R.S. 14:30.[1] Defendant was appointed counsel and entered a plea of not guilty on September 5, 1984. On November 27, 1984, a twelve person jury found the defendant guilty as charged. In the penalty phase of defendant's bifurcated trial, the panel *567 unanimously recommended the death penalty, finding the existence of three aggravating circumstances: (1) the victim had been killed during the commission of an armed robbery; (2) the offense was committed in a particularly heinous, atrocious and cruel manner; and (3) the victim was a witness to a crime committed by the defendant. See La.C.Cr.P. 905.4 (1984). On January 29, 1984, the defendant was sentenced to death.
The following evidence was adduced at trial. On June 26, 1984, Byrne ended a 4 month liaison with a Leesville cocktail waitress, a Korean woman named Ha Su Hyant, by moving out of her mobile home and "borrowing" her 1984 beige and black Chevrolet Chevette. Byrne drove to Bossier City where he contacted Gary Clements, a friend and former co-worker. Clements informed the defendant that a friend, "Robbie" Johnson, managed a Racetrack Service Station located in Bossier City, and that in her position she handled large sums of money. Byrne requested that Clements introduce him to Roberta. Defendant and Roberta began dating shortly thereafter.
Roberta was described as being about 5'8" tall, and weighing about 250-300 lbs. Her roommate describes her as being extremely attractive, but insecure about being heavy. On the other hand, the defendant is 6'3" tall, and weighed about 190 lbs. It was the state's contention that the defendant's friendship with Roberta Johnson was fostered by his intention to rob her. Byrne acknowledged that "he began thinking about [the planned robbery] before [he] started going with Robbie." While it was shown that the two eventually became lovers, the defendant admitted that the robbery was the "only reason [why he] went with [Roberta] to start with."
During their relationship, Byrne became familiar with Roberta's business routine. He often drove Roberta to work and visited her there with sufficient frequency to become known to other service station employees. Roberta often spoke to Byrne about the daily bank deposits which she was required to make. On at least two occassions, Byrne drove Roberta to the National Bank of Bossier where she deposited the service station's daily receipts. It was over this course of events that the defendant learned that the amount of the deposits ranged from seven to ten thousand dollars.
At 10:00 a.m. on August 13, 1984, Teresa Hudgins, Roberta's roommate, left their Mark Avenue home and drove to Longview, Texas for an overnight stay at her parents' home. She was not to return until about 6:00 p.m. the following day. The defendant was aware of this fact, and on August 13, he spent the night with Roberta. The following day, the defendant dropped her off at work at approximately 6:00 a.m. Byrne returned at approximately 9:00 a.m. and joined Roberta in the manager's office. He was observed by the cashier on duty, Mary Carroll, and the second shift attendant, Mary Jo Breedlove, who had stopped at the station to purchase gasoline and speak with Roberta. Both recognized the late model Chevette parked next to the manager's office as "belonging" to Byrne. At some point, Byrne and Roberta carried a supply of cigarettes from the manager's office to the cashier's booth. The two returned to the manager's office "just a laughing and hugging[,] just ... happy." Upon returning, Roberta told Byrne that they could leave for the bank immediately after she removed the service station's daily receipts from the floor safe located in the cashier's booth. At that point, Byrne decided that the time to carry out his robbery plan had arrived.
Roberta Johnson returned to the office carrying a "big blue bag," subsequently determined to have contained $7,686.60. When Roberta turned to leave the office, Byrne struck her on the base of the neck with a "ballpeen" hammer. Byrne found the hammer on top of a desk in the manager's office and used it because it "was the nearest available weapon." Roberta cried out and fell down and started screaming. Byrne continued to strike Roberta's head as she lay face down on the concrete office floor. Byrne bludgeoned the victim about the back of the head and neck "[u]ntil she *568 quit screaming and crying." Byrne then removed the money pouch from underneath the victim's body and the office keys from her purse. He dropped the hammer on the floor, exited the office and locked the door behind him. The service station attendant, Mary Carroll, apparently did not hear the victim's screams and was not immediately aware of the incident. As she shelved cigarettes, she observed the beige and black Chevette drive away from the station, but was unable to see the automobile's occupant(s). Byrne fled the service station in the borrowed Chevette and drove south to Leesville.
At noon, Byrne stopped by the Leesville home of Dorothy Lacombe, a cocktail waitress at the "Town Tapper Lounge," and unsuccessfully invited her to dinner. Byrne then checked into the Continental Motor Lodge at 1:29 p.m. He paid for the room with a $100.00 bill. Although unaccompanied at the time, Byrne informed the clerk that the room would be occupied by two people. He then went to numerous night clubs around Leesville, and at around 2:00 a.m. on August 15, 1984, Byrne convinced Ms. Lacombe to spend the night with him. Upon reaching the motel room Byrne asked Ms. Lacombe to marry him. Ms. Lacombe agreed. Their plan was to go to Mexico where she could first obtain a divorce, and then marry Byrne.
Meanwhile, the regional office of Racetrack Service Station, as was its routine, had telephoned the National Bank of Bossier to ascertain the amount deposited that day by its Bossier City outlet. It was informed that no deposit had been made that day. At 2:00 p.m. on the day of the homicide, a representative of the regional office informed Mary Carroll that Roberta, her boss, had failed to appear at the bank as required by company policy. Upon confirming this fact with a bank official, Ms. Carroll contacted Patricia Allen, the assistant manager of the service station, and advised her of the situation. Ms. Allen arrived at the service station a few minutes later and proceeded to the manager's office to locate the telephone number of the regional office. Ms. Allen unlocked the office door and discovered Roberta Johnson's body. She immediately notified the Bossier City Police.
Bossier City Detective George West obtained a description of the automobile driven by the defendant and determined that it was owned by Ha Su Hyant of Leesville. Upon enlisting the assistance of the Leesville Police, officer Harry James of that department contacted Ms. Hyant at her mobile home on the morning of August 15 at 2:22 a.m. Officer James was informed that Byrne was in Leesville, and that he continued to use the Chevette. At 3:08 a.m., officers West and Scott discovered the suspect automobile in the parking lot of the Continental Motor Lodge. After consulting the desk clerk, the officers proceeded to Room 114 where Byrne, nude and accompanied by Dorothy Lacombe, was placed under arrest and advised of his Miranda rights. Approximately $6,900 in cash was seized from the motel room. Byrne was taken to the Leesville Police Station where he was booked, photographed and fingerprinted. During this process, and after being advised of his Miranda rights, Byrne asked a policeman whether Roberta Johnson had died. Scott responded affirmatively and asked the defendant what he expected to happen. Byrne responded that he "expected to be long gone before anybody found out what happened." Byrne then admitted hitting the victim with the hammer several times.
Later that afternoon, Detective West of Bossier City assumed custody of Byrne and transported him to Bossier City. After being Mirandized, and en route to Bossier City, defendant admitted "having planned this armed robbery from the very beginning...." Byrne restated his surprise at his immediate apprehension and advised Detective West that he had planned to initially flee directly to Florida. At the Bossier City Police Station, Byrne confessed that he had killed Roberta Johnson while perpretrating the robbery during a taped interview with police. As the only eyewitness to the homicide, defendant provided police with this account of the incident *569 in a taped confession recorded shortly after his arrest. There is no question that the confession was free and voluntary, and that the defendant had been properly Mirandized. The confession was admitted into evidence, and the defendant acknowledged the accuracy of this account of the incident during cross-examination.
An autopsy of the victim conducted by Dr. McCormick, the Bossier Parish Coroner, revealed that Roberta died as a result of shock "due to multiple traumatic injuries consisting primarily of multiple fractures and brain injury." The victim's body evidenced the infliction of at least twelve and possibly as many as fifteen blows administered by a round object, whose size and configuration was consistent with the round end of a hammer. At trial, the coroner was shown the hammer seized from the scene of the crime. He testified that the victim's wounds were made by that hammer "or one identical to it." Twelve round bruises or contusions indicated that six (6) blows had been administered to the victim's upper back, two (2) to her neck and four (4) to her head. According to Dr. McCormick, the hammer blows were inflicted with great force and viciousness characteristic of a "blitz attack" from behind. It was his opinion that the number and severity of the wounds evidenced classic "overkill." Although some of the blows could have been administered after the victim was rendered unconscious, there was no evidence of post-mortem wounds.
For his part, Byrne did not deny the fact that he had killed Roberta Johnson. His defense was predicated solely on his testimony that he did not intend to kill Roberta, but intended merely to knock her unconscious to avoid immediate apprehension. Byrne claimed to have placed a broom over the victim's head to insulate her from the full impact of the hammer blows; however, the testimony of the coroner showed that the force of the blows was not reduced by any protective matting or buffering agent.

ASSIGNMENTS OF ERROR
This case is before this Court by virtue of Article 5, section 5(D) of the Louisiana Constitution of 1974 which grants this Court original appellate jurisdiction in capital cases. La.Const. Art. 5, section 5(D) (Supp.1985); La.C.Cr.P. 912.1 (1984). On appeal the defendant relies upon nine briefed assignments of error. In this opinion we will treat six assignments of error (assignments 1, 5, 6, 7, 8 and 9) and will review the sentence. The defendant's remaining assignments involve legal issues governed by established principles of law and will be treated in an unpublished appendix which will comprise part of the record in this case. Our review will show that none of the assignments warrant reversal and we therefore affirm the conviction and sentence.

Assignment of Error No. 1
In this assignment of error, defendant contends that the trial court erred in denying his motion for a mistrial made after the prosecutor allegedly raised the possibility of a pardon or commutation of sentence by the governor. While conducting voir dire, defense counsel was attempting to explain the sentencing alternatives available to the jury. Defense counsel stated that there are only two choices, life imprisonment and the death penalty. In an attempt to influence the jury in favor of life imprisonment, defense counsel argued in essence that life imprisonment meant life, and that no one (i.e. the judge or the parole board) had authority to release the defendant prior to his death. The state objected to defense counsel's comments on the ground that they were not accurate statements of the law. An argument between counsel then ensued wherein the District Attorney stated that defense counsel "knows full well what ... the possibilities are." The trial court sustained the state's objection and admonished the jury that the statements made by the attorneys "may or may not be the law." The trial judge continued, stating that the jurors would be duty bound to apply the law as given by the court at the close of the case, regardless of what the attorneys may or may not say.
*570 Later in voir dire, defense counsel again stated that the parole board was precluded from granting a parole to a person sentenced to life imprisonment. This statement was again met by the state's objection. The trial court overruled the objection, warning defense counsel that he might be opening the door for further explanation of what the parole board might do in a first degree murder situation. Similarly, the trial judge admonished the jury.
We note here that the objections of the prosecutor were not necessarily well founded. The statements of defense counsel are not inaccurate; they are, however, incomplete. Pardons and commutations of sentences are handled by a differently constituted board, see La.R.S. 15:572.1 et seq. (1981, and as amended), than the Parole Board. See La.R.S. 15:574.2 et seq. (1981, and as amended). In fact, the Parole Board has absolutely no authority to recommend pardons or commutations of sentences, or to restore parole eligibility in cases where the legislature has otherwise provided. For the reasons stated below, we find no reversible error.
The conditions under which a person sentenced to life imprisonment without the benefit of parole, probation, or suspension of sentence can be released in the future are not a proper consideration for a capital sentencing jury, and shall not be discussed in the jury's presence. State v. Copeland, 419 So.2d 899 (La.1982) (and authorities cited therein); State v. Lindsey, 404 So.2d 466 (La.1981), cert. denied 464 U.S. 908, 104 S.Ct. 261, 78 L.Ed.2d 246 (1983). The prohibition against discussion of the possibility of an offender's future release is not limited to the sentencing phase of a capital case, but extends to voir dire. Copeland, supra.[2] Although this prohibition applies to every phase of a capital case, not every reference to the possibility of pardon or commutation of sentence made during the course of a trial constitutes reversible error.
In State v. Sawyer, 422 So.2d 95 (La. 1982), cert. granted and case remanded 463 U.S. 1223, 103 S.Ct. 3567, 77 L.Ed.2d 1407 (1983), affirmed 442 So.2d 1136 (La. 1983), cert. denied 466 U.S. 931, 104 S.Ct. 1719, 80 L.Ed.2d 191 (1984), this Court in refusing to reverse defendant's death sentence observed:
We have never held, however, that an automatic reversal of the death penalty must follow the mere mention of the fact that R.S. 14:30's prohibition against probation or parole for one under sentence of life imprisonment does not exclude executive pardon. Each case must be decided on its own facts and circumstances.
Here, the cryptic and brief comment came in response to the defense attorney's final plea to the jury to spare the defendant's life and to sentence him to the "living death of life imprisonment", which implied that defendant could never be released. Had the prosecutor done more than make a passing responsive comment on the possibility of a pardon, perhaps a reversal would be warranted.
422 So.2d at 104 (footnote omitted).
Here, unlike Sawyer, supra, the prosecutor did not directly interject into the proceeding the possibility of pardon or commutation of sentence. In fact the only explicit reference to the possibility of future pardon presently complained of was made by defense counsel in his motion for mistrial:
Your Honor, I would move for a mistrial on the basis of Mr. Brown's statement. I think that it's improper for Mr. Brown to raise the element of the possibility of a release when dealing with a death penalty case.
*571 The defendant concedes as much since his argument focuses on the "inference" of future release. The inference, if any, is very tenuous. Even assuming that such an inference could be gleaned from the exchange between the prosecutor and defense counsel, in the context of the entire record, the prosecutor's objections to defense counsel's statements neither deflected the jury's attention from the ultimate significance and finality of the penalty recommendation nor misguided the jury's sentencing discretion by introducing arbitrary factors.
Similarly, in State v. Glass, 455 So.2d 659 (La.1984), cert. denied ___ U.S. ___, 105 S.Ct. 2159, 85 L.Ed.2d 514 (1985), this Court determined that questions asked of a defense witness by the state during cross-examination at the penalty phase did not interject an arbitrary factor into the jury's sentencing discretion. The complained of examination was the testimony of Nancy Goodwin, former director of the Louisiana Coalition of Jails and Prisons, who was called by defense counsel. The substance of her testimony was for the purpose of showing how many "lifers" have been pardoned. On cross-examination, the state made reference to the possibility of executive pardon. Noting that the defense had opened the door on the subject, we concluded that the information concerning pardons fell short of the damaging comments which mandated reversal in Lindsey, supra, and State v. Willie, 410 So.2d 1019 (La.1982), cert. denied 465 U.S. 1051, 104 S.Ct. 1327, 79 L.Ed.2d 723 (1984). Like Glass, supra, defense counsel arguably opened the door for the state's objection, and the objections were even less damaging than the direct references in Glass, supra. The state's objections were merely to correct defense counsel's improper implications that a murderer under sentence of life imprisonment can never be released. State v. Sawyer, 422 So.2d at 104, fn. 20.
Lastly, each objection was followed by the trial judge's admonition that jurors were obligated to accept the law as provided by the court at the close of the trial, and that the statements of the attorney's were not the law. Under the circumstances of the instant case, we are convinced that this procedure insured that the jury was not influenced by an arbitrary factor. As noted in State v. Lindsey, supra:
In reviewing a capital case in which an offender's potential for future release has been interjected into the proceedings by the state or the trial court, this Court must presume that a death sentence was imposed under the influence of an arbitrary factor, unless the record clearly indicates that the jury was properly informed of its duty and admonished to disregard the improper remark, and the record indicates that the jury heeded the admonition.
In the case at bar, the trial judge adequately admonished the jury to disregard the improper remarks, and informed jurors of their duty.
This assignment is without merit.

Assignment of Error No. 5
In this assignment of error, defendant contends that reversible error occurred when the prosecutor exceeded the scope of permissible argument in both the guilt and sentencing phases of Byrne's bifurcated trial. In the guilt phase, the defendant specifically complains of the prosecutor's closing argument, centering on a theme reiterated throughout trial, that the defendant had a "lifelong habit of deceiving people." Additionally, the defendant complains of certain comments, quoted in full, infra, made by the prosecutor during his rebuttal argument. In the sentencing phase, the defendant objects to the argument of the prosecutor which focused on the character of the victim, Roberta Johnson, as compared to the character of the defendant. It is alleged that the improper remarks made in both phases of the trial appealed to the jury's passions, prejudices and emotions.
Under Code of Criminal Procedure article 774, the arguments of counsel must be confined to the evidence admitted, to conclusions of fact that may be drawn therefrom and to the law applicable to the case. *572 La.C.Cr.P. art. 774 (1981); See State v. White, 399 So.2d 172 (La.1981). The sole unresolved issue in the guilt phase was whether Byrne acted with the specific intent to kill or inflict great bodily harm on the victim. The defendant testified that he did not intend to kill Roberta Johnson, but merely intended to render her unconscious to effectuate his escape. In connection with his testimony, Byrne claimed to have placed a broom over the victim's head to reduce the force of the blows. The testimony of the coroner does not support Byrne's latter statement. Following a summary of the circumstantial and medical evidence supporting the inference of specific intent, the prosecutor sought to discredit Byrne's testimony by refering to his "lifelong habit" of deceiving people, and arguing that Byrne would deceive you, the jury, similarly. While defense counsel failed to contemporaneously object to this comment, such failure will not preclude this Court from reviewing the alleged improper remark. State v. Thomas, 427 So.2d 428 (La.1983).
As a general rule, factors affecting the credibility of witnesses are permissible subjects for closing argument where the facts bearing on a witness' credibility appear in the record. State v. Monroe, 397 So.2d 1258 (La.1981), cert. denied 463 U.S. 1229, 103 S.Ct. 3571, 77 L.Ed.2d 1411 (1983); State v. Sayles, 395 So.2d 695 (La. 1981). However, from the evidence adduced at trial, the inference of a "lifelong habit of" deceit is somewhat exaggerated. The evidence shows that the defendant's only reason for going out with Roberta was to facilitate the robbery. Additionally, the defendant continued to use Ms. Hyant's automobile with questionable authority after their relationship ended. Shortly after the murder, and only hours before requesting that Dorothy Lacombe accompany him to Mexico for a marriage, Byrne promised to return the automobile to Ms. Hyant. Lastly, the defendant had been court-martialed by the army for being absent without leave.
While the evidence shows that Byrne was in the habit of deceiving people, the prosecutor overstated the inference by referring to it as "lifelong." The presentence investigation report indicates that the last of Byrne's three court-martials occurred on March 17, 1982. The other two court-martials occurred within the three years proceeding the present prosecution. The remaining allegedly "deceitful" episodes apparently relied upon by the prosecutor occurred during the six months proceeding Byrne's arrest. In this regard, we conclude that the characterization of the defendant's habit of deceit as being "lifelong" is an exaggeration when viewed in the context of the entire record. While the argument borders on being improper, for the following reasons we refuse to so hold, and the error, if any, was at most harmless.
Before an allegedly prejudicial remark requires reversal, this Court must be thoroughly convinced that the jury was influenced by the remark and that it contributed to the verdict. State v. Jarman, 445 So.2d 1184 (La.1984); State v. Knighton, 436 So.2d 1141 (La.1983), cert. denied 465 U.S. 1051, 104 S.Ct. 1330, 79 L.Ed.2d 725 (1984); State v. Sharp, 418 So.2d 1344 (La. 1982). Defendant's participation in the killing was never contested. In fact, defense counsel acknowledged that his client had killed Roberta Johnson at the outset of his opening statement. In view of the overwhelming circumstantial as well as medical evidence supporting the jury's finding of specific intent, we are not convinced that the improper remarks concerning Byrne's credibility influenced the jury or contributed to its verdict. The number and severity of the wounds suffered by the victim provided concrete proof that the defendant specifically intended to kill or inflict great bodily harm on the victim. Moreover, Byrne's repeatedly stated belief that he had bought more time to escape than was eventually afforded him is inconsistent with a person's natural feeling of remorse when not having intended to kill someone.
*573 Secondly, defendant complains of two remarks made by the prosecutor during rebuttal argument. In his closing argument, defense counsel directed the jury's attention to evidence which he argued was inconsistent with the state of mind necessary to commit first degree murder. He argued that the alleged act of buffering the blows with a broom, Byrne's inquiry of the arresting officer concerning the victim's fate, and Byrne's testimony that his decision to implement the robbery plan was reached only moments before the act, all mitigate against the specific intent necessary for first degree murder. The prosecutor then stated during rebuttal:
Now, I could sit here and I could go through all the evidence that transpired and talk to you about what each piece of evidence showed to show that he had this specific intent. But you know that. That's why it's difficult to argue this I mean, I'm arguing something that's obvious. This little girl was a decent, nice little girl. She was used as the Korean girl was used, as Dorothy Lacombe was used
Defendant objected and the trial court sustained the objection, admonishing the prosecutor not to appeal to the prejudice, sympathy or passions of the jury.
It is apparent that defense counsel was attempting to paint the defendant as a caring person, a person who, although administering the blows which ultimately resulted in the death of Roberta Johnson, did not specifically intend to kill or seriously injure Roberta. Under Article 774, the proper scope of rebuttal argument is to be confined to answering the argument of the defendant. The prosecutor complied with the mandates of Article 774. As stated previously the evidence adduced at trial supported the inference that the defendant was in the habit of using and deceiving people and no undue prejudice was shown. Cf. State v. Summit, 454 So.2d 1100 (La. 1984), cert. denied ___ U.S. ___, 105 S.Ct. 1411, 84 L.Ed.2d 800 (1985). In any event, the admonition by the trial judge cured any slight prejudice which may have resulted from the prosecutor's reference to Byrne's manipulative relationship with other women.
Defense counsel ended his closing argument in the following manner:
But be that as it may, you wonder why, if he did itno question that he did it, he would tell you he would take the witness stand, look you in the eye and say, yes, I did it. Why did we even have to be here today? There's only one reason. Mr. Brown wants blood.
In response, the prosecutor stated:
The man is guilty and I don'tyou know, Isort of get tired sometimes. Everybody wants to try the police for caring about Robbie Johnson. They want to try the District Attorney for caring about Robbie Johnson.
Defendant objected to this comment, however, the trial court overruled the objection. The prosecutor continued:
The police, the prosecutor, they don't want blood. We want justice. We want the truth to prevail. We want the right punishment. We want the right conviction for what was done ... And nobody's looking for blood; we're looking for the truth. And we're looking for justice. And justice demands only one thing, and that is that this man is guilty of what he did. And what he did is First Degree Murder.
As to this exchange, the statement by defense counsel as to the possible motive of the prosecutor in trying the defendant is clearly beyond the scope of Article 774. This Court as noted in State v. Morris, 404 So.2d 1186 (La.1981) has occasionally given prosecutors some latitude to use argument outside the scope of Article 774 to refute defense argument of a like character. Prosecutors, however, do not have free reign to make any response they choose, particularly if they seek to emphasize their personal belief about a defendant's guilt. State v. Hamilton, 356 So.2d 1360 (La.1978). We feel that the present situation is within the latitude accorded prosecutors under Morris, supra. The prosecutor merely sought to refute the *574 prejudicial and improper comments made by defense counsel. He did not interject, with any probative force, his opinion as to the guilt of Byrne. It was the weight of the evidence, including the defendant's admissions, which supported the jury's finding of guilt. Therefore, there was no reversible error. See State v. Kaufman, 304 So.2d 300 (La.1974), cert. denied 429 U.S. 981, 97 S.Ct. 495, 50 L.Ed.2d 591 (1976).
Lastly, during the sentencing stage the prosecutor restated the theme presented by the state throughout the trial: Byrne used Roberta Johnson in much the same manner as he did all of his female friends. As the prosecutor stated: "And this little girl was used by the man she thought she loved. And that's the way it was planned from the very beginning. That makes it a lot worse." The state called only one witness at this phase of the proceeding, defendant's friend of eleven months, Gary Clements. The witness substantiated the state's position by testifying that Byrne had stated that he was merely using Roberta. He further testified that Byrne did not have any affection for the Korean girl with whom he had lived, and whose car he had been driving.
During closing argument, the prosecutor stressed Clements testimony and continued to reiterate the theme that Byrne merely used women; that he did not care about any woman, much less the victim. The prosecutor next turned to a discussion of the victim. In his argument, the prosecutor contrasted the victim with the defendant. Defense counsel objected to these remarks as improper. The trial judge admonished the jury "not to be influenced by sympathy, passion or prejudice," but allowed the prosecutor to continue his argument. The prosecutor continued:
"Robbiesteady employeein May of this year promoted to manager of the Racetrack Station where she'd worked since 1982. He[r] mother died when she was 17. He[r] father died in October of this year, after she was buried. They can't be here today. Dependable. A good decent girl who loved this man. Who really cared for him. Who respected him. The evidence will show you something about this defendant. He used people; he didn't care for people; he didn't respect people."
The defendant complains that the prosecutor's comments appealed to the passions, prejudices and emotions of the jury, and as such constitute reversible error.
As far as applicable, the procedure and order of the sentencing hearing should conform to that of the trial. La.C.Cr.P. art. 765 (1981), and La.C.Cr.P. art. 905.2 (1984)[3]; State v. Knighton, supra. Article 774 which governs the argument of counsel is applicable to capital sentencing procedure by virtue of Article 905.2. See State v. Lindsey, supra. Thus while this Court may look to Article 774 to determine if the argument was improper, in reviewing whether it constitutes reversible error, this Court must look to whether the argument introduced passion, prejudice or any other arbitrary factor into the proceeding which contributed to the jury's recommendation of the death penalty. State v. Lindsey, 404 So.2d at 483.
The prosecutor's description of the defendant's relationships with the victim as well as other women is a fair one supported by the evidence. This time there was no arguably exaggerated reference to it being "lifelong." Moreover, the calculated manner in which Byrne won the trust and companionship of Roberta is an integral circumstance of the offense committed by *575 him. As to the evidence of Byrne's relationships with other women, evidence of such relationships did not introduce an arbitrary factor. Under Article 905.2, character evidence is admissible during the penalty phase as the offender's character is the primary issue. Evidence of the defendant's prior relationships was relevant to show character, just as it was relevant for the defendant to introduce the testimony of his parents to mitigate against the death penalty.
As to the argument which contrasted the victims innocence with the character of the defendant, this Court has recently determined that a prosecutor's contrasting of the victim's innocence with the brutal manner of her death was not improper. State v. Jones, 474 So.2d 919 (La.1985); Accord, State v. Rault, 445 So.2d 1203 (La.1984), cert. denied, ___ U.S. ___, 105 S.Ct. 225, 83 L.Ed.2d 154 (1984). Similarly, the comments in the instant case were not improper. Moreover, the evidence of the victim's innocence was already properly admitted, and the argument did not interject an arbitrary factor.

CAPITAL SENTENCE REVIEW[4]

Assignment of Error Nos. 6, 7 and 8
By these assignments of error, the defendant claims that the failure of one of the three aggravating circumstances found by the jury interjected into the proceeding an arbitrary factor. It is the defendant's position that Code of Criminal Procedure article 905.4(h), which lists as an aggravating factor the fact that the defendant has killed a person who is a witness to a crime committed by the defendant, is inapplicable to the instant case under this Court's opinion in State v. Loyd, 459 So.2d 498 (La. 1984). While we conclude that the defendant is correct that Article 905.4(h) is inapplicable, we are convinced that the inclusion and finding of an unsupported aggravating factor in this case did not interject an arbitrary factor into the proceeding.
In State v. Loyd, supra, this Court ruled that Article 905.4(h) is inapplicable unless the homicide victim was an eyewitness to an earlier independent crime committed by the defendant. A showing that the victim witnessed her own death as a result of the underlying felony which makes the homicide first degree murder will not support a finding of the existence of this aggravating circumstance. In this case, there was no evidence that the victim had witnessed Byrne commit another crime other than the armed robbery which resulted in her death. Thus, the jury's finding of this aggravating circumstance was incorrect.[5] However, the failure of an aggravating circumstance does not warrant the reversal of the death penalty, unless the evidence in support of the failed aggravating circumstance interjected into the proceeding an arbitrary factor. State v. Wingo, 457 So.2d 1159 (La.1984), cert. denied ___ U.S. ___, 105 S.Ct. 2049, 85 L.Ed.2d 322 (1985); State v. Fuller, 454 So.2d 119 (La.1984).
This Court has on many occasions held that the failure of an aggravating circumstance does not so taint the jury's recommendation so as to warrant *576 reversal, provided that there is sufficient evidence to support the finding of at least one aggravating circumstance. La.C.Cr.P. 905.3 (1984); State v. Jones, supra; State v. Glass, supra; State v. Fuller, supra; State v. Rault, supra; State v. Kirkpatrick, 443 So.2d 546 (La.1983), cert. denied, 466 U.S. 993, 104 S.Ct. 2374, 80 L.Ed.2d 847 (1984); Sawyer v. State, supra (on remand). The evidence fully supports the jury's finding that Roberta Johnson died during the commission of an armed robbery. The defendant admitted that he administered the fatal blows during the robbery of Roberta. On the witness stand, defendant gave a more detailed account of the robbery. Police recovered $6,962.25 of the $7,686.60 taken from the Racetrack Service Station from defendant's motel room.[6]
The common thread which supports the reasoning of this Court's opinions is that if the evidence in support of the failed aggravating circumstance is otherwise admissible, and thus is properly before the jury, the possibility of an arbitrary factor being interjected is very remote. See generally, Sawyer v. State, supra (on remand) (The Court found that admissible evidence relevant to a failed aggravating circumstance did not interject an arbitrary factor.); State v. James, 431 So.2d 399 (La.1983), cert. denied 464 U.S. 908, 104 S.Ct. 263, 78 L.Ed.2d 247 (1983) (Blanche, J. dissenting: Arguably inadmissible evidence interjected an arbitrary factor and warranted a new sentencing hearing.).
In the present case, the jury already heard all of the evidence relating to the fact that the victim was a witness to the robbery which resulted in her death. It is not argued, nor could it be that this evidence is inadmissible. At the sentencing phase, the prosecutor only called one witness, Gary Clements. To support the finding of all or any one of the aggravating circumstances, the prosecutor merely requested that the evidence admitted at trial be reintroduced at this stage of the proceeding. Therefore, the finding of the unproved aggravating circumstance did not interject an arbitrary factor into the proceeding as it rested upon otherwise admissible evidence adduced at the guilt stage.

These assignments, therefore, lack merit

Assignment of Error No. 9
The final focus of this Court's sentence review in a capital case is to determine, when considering the crime and the defendant, whether the sentence imposed in the instant case is disproportionate to the penalty imposed in similar cases in the same judicial district. State v. Narcisse, 426 So.2d 118 (La.1983), cert. denied 464 U.S. 865, 104 S.Ct. 202, 78 L.Ed.2d 176 (1983). The initial focus in this inquiry is on the defendant and the crime. After this inquiry, we focus on the proportionality of the defendant's sentence. Note, Capital Sentence Review Under Supreme Court Rule 28, 42 La.L.Rev. 1100 (1982).
Byrne, a twenty-four year old white male, upon learning that the victim carried large sums of money, purposely met the victim and became her boyfriend. The sole purpose of the meeting was to rob the victim. After a brief romance with the overweight manager of the Racetrack Service Station, on August 14, 1984, Byrne *577 met the victim in the manager's office and after she had removed the daily cash receipts, he struck her from behind with a "ballpeen" hammer. Byrne struck the victim approximately 12 to 15 times, crushing her skull and tearing the skin from her face as it rebounded off the concrete. For some time during this attack, if not during the entire attack, the victim was conscious. Byrne fled to Leesville, where he attempted to pick up another woman, allegedly for the purposes of marriage. A reading of Byrne's testimony as well as his statements indicate that he had no remorse. When confronted, his main thought was that he had more time to escape.
In the sentencing hearing, defense counsel attempted to present mitigating factors through the testimony of Byrne's parents. The common theme of their testimony was that their son was a victim of a transient home. Byrne's father was in the Air Force, and the family had had several homes. Byrne's parents testified that he had a hard time making friends. In contradiction, the state showed that Byrne had been court-martialed from the Armed Service, and had had a life of encounters with the law (all of them misdemeanors). Additionally, the state showed that Byrne had lived with numerous women who supported him.
Considering both the defendant and the cruel crime he perpetrated, we are unable to conclude that the death sentence is unwarranted in the instant case. We next must determine if the death penalty is proportional by considering similar cases in the same jurisdiction.
Pursuant to Rule 28, section 4, the state and the defendant have filed sentence review memoranda. La. Supreme Court Rule 28, section 4 (Supp.1985). The state's memorandum lists fifteen first degree murder cases in Bossier Parish in which sentence was imposed after January 1, 1976. Not listed were the cases arising from Webster Parish (both Webster and Bossier being in the 26th Judicial District) since the crime occurred in Bossier Parish. Of all the cases cited, we conclude that only one case is similar to the instant prosecutionState v. Knighton, supra.[7]
In Knighton, supra, the defendant was found guilty of first degree murder and sentenced to death. The conviction stemmed from the armed robbery of an attendant of the Fina Service Station. During the course of the robbery, the defendant, apparently unprovoked, shot and killed Mr. Shell. The jury in returning the death penalty found the existence of two aggravating circumstances; (1) the defendant was engaged in the perpetration of an armed robbery, and (2) the defendant knowingly created a risk of death to more than one person. This Court pretermitted the question of whether the evidence supported the second aggravating circumstance, and affirmed the death penalty based on the sole aggravating circumstance of the armed robbery. Knighton was a convicted felon with a juvenile and extensive adult record. No mitigating circumstances were presented.
While Knighton, supra, is arguably distinguishable because of the prior criminal record, in our opinion Knighton, supra, stands for the proposition that the death penalty in the situation of an armed robbery and one-shot killing is not disproportionate *578 to other first degree murder prosecutions in the 26th Judicial District. This Court has consistently affirmed the death penalty in other single-shot armed robbery cases. See, State v. Busby, 464 So.2d 262 (La.1985); State v. Wingo, supra; State v. Glass, supra; State v. James, supra; State v. Lindsey, supra.[8]
This assignment lacks merit.

DECREE
For the foregoing reasons, we find defendant's assignments of error relative to his conviction and sentence without merit. The conviction and sentence are affirmed.
CONVICTION AND SENTENCE AFFIRMED.
NOTES
[1] First degree murder is the killing of a human being:

(1) When the offender has specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of ... armed robbery or simple robbery;
. . . . . .
Whoever commits the crime of first degree murder shall be punished by death or life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence in accordance with the recommendation of the jury. La.R.S. 14:30 (Supp.1985).
[2] This Court in Copeland, supra, noted that the discussion of the possibility of pardon on voir dire in that case "would likely constitute a basis for reversal of the sentence phase had [we] not already determined that defendant [was] entitled to a new trial entirely." 419 So.2d at 910. In Copeland, supra, the reference to pardon was direct and made by the trial judge himself. The discussion of the possibility of pardon was extensive, and at no time were jurors admonished to disregard the references to pardon. Therefore, Copeland, supra, is inopposite to the present situation.
[3] The full text of Article 905.2 is as follows:

The sentencing hearing shall focus on the circumstances of the offense and the character and propensities of the offender. Evidence relative to aggravating or mitigating circumstances shall be relevant irrespective of whether the defendant places his character at issue. Insofar as applicable, the procedure shall be the same as that provided for trial in the Code of Criminal Procedure. The jury may consider any evidence offered at the trial on the issue of guilt. The defendant may testify in his own behalf. In the event of retrial the defendant's testimony shall not be admissible except for purposes of impeachment.
[4] Supreme Court Rule 28, section 1, as required by La.C.Cr.P. 905.9 (1984), outlines the criteria used by this Court to review a capital sentence to determine if it is excessive. In making such a determination, the Court shall determine:

(a) whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factors, and
(b) whether the evidence supports the jury's finding of a statutory aggravating circumstance, and
(c) whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
La. Supreme Court Rule 28, section 1 (Supp. 1985).
[5] We note that in situations where prosecutors are seeking to have juries consider aggravating circumstances which are scantily supported by the evidence, or which, as in this case, have been determined to be inapplicable, they do so at their own peril. More often than not if the evidence supporting the aggravating circumstance is otherwise admissible, there will not be a finding that an arbitrary factor was interjected into the proceeding. This is not to say that it could never threaten a conviction and sentence otherwise valid.
[6] While there may be some doubt as to whether the second aggravating circumstance (The crime was committed in a particularly heinous, atrocious or cruel manner.) is supported by the evidence, see State v. Baldwin, 388 So.2d 664 (La.1980), cert. denied 449 U.S. 1103, 101 S.Ct. 901, 66 L.Ed.2d 830 (1981), the testimony of the coroner indicated that there were no post-mortem wounds. We feel that the jury could find beyond a reasonable doubt that the second aggravating circumstance existed. Cf. State v. Monroe, supra. Here the defendant brutally beat the victim with a "ballpeen" hammer approximately 12 to 15 times, crushing her skull. The blows were administered while the victim was face down on a concrete floor thus causing the skin on her face to be torn. While it is uncertain how long the victim remained conscious during the beating, it is clear that she was conscious for some part of the ordeal. Dr. McCormick's testimony substantiates this conclusion. In any event, even of this aggravating circumstance also fails, the evidence which supported the jury's conclusion was already properly before the jury, and as a result the finding of this aggravating circumstance, even if improper, did not interject an arbitrary factor warranting reversal.
[7] This Court in Knighton, supra, has reviewed all but three of the fifteen cases listed in the sentencing memoranda. For various reasons, they were inopposite to an armed robbery/murder as was involved in Knighton, supra. For the reasons stated therein, we believe that they are also inopposite to the instant case.

Of the three cases which were not previously reviewed by this Court, State v. Smead, 26th Judicial District Court, No. 61,623, and State v. Thompkins, 26th Judicial District Court, No. 60,856 resulted in the defendants being sentenced to life imprisonment after they had pled guilty to first degree murder. These cases are not similar.
The remaining case of State v. McGuffy, 26th Judicial District Court, No. 62,055 resulted in the defendant being sentenced to life imprisonment for the brutal beating and stabbing death of a 46 year old woman. Both parties had been drinking, and there were overtones that the victim had engaged in adulterous relationships. This case is inopposite.
[8] We note that the proportionality review of death sentences within a judicial district (as opposed to a Parish-wide review as both the state and defense counsel assume is required by Section 4), rather than a state-wide basis passes constitutional muster. State v. Flowers, 441 So.2d 707 (La.1983), cert. denied 466 U.S. 945, 104 S.Ct. 1931, 80 L.Ed.2d 476 (1984). We do not intend to change established procedure by referring to cases throughout the state; however, we note that the district-wide inquiry is the minimum required by the constitution. Therefore, a state-wide inquiry, more encompassing than a district-wide inquiry, would also pass constitutional muster.