ROSEMARY LEDET, Judge.
|,In this criminal case, the defendant, Gerald Williams, appeals his second degree murder conviction and his life sentence. On appeal, Mr. Williams assigns two errors relating to the trial court’s denial of his motion for a mistrial. Because we find his assignments of error unpersuasive and find after a review of the entire record no errors patent, we affirm.

STATEMENT OF THE CASE

In October 2008, Mr. Williams was charged by indictment with second degree murder, a violation of La. R.S. 14:30.1; he pled not guilty. In July 2009, the trial court denied the defense’s motion to suppress identification. In February 2010, a jury trial was held. The jury found Mr. Williams guilty as charged. In March 2010, Mr. Williams filed a motion for a new trial. In June 2010, the trial court denied his motion for a new trial. From this ruling, Mr. Williams filed applications for supervisory writ with both this court and the Louisiana Supreme Court, which were denied.[1] In January 2011, the trial court sentenced Mr. Williams |2to life in prison at hard labor without benefit of probation, parole, or suspension of sentence. Also in January 2011, Mr. Williams filed a motion for appeal, a motion to reconsider sentence, a motion for a post-verdict judgment of acquittal, and a motion for a new trial. The trial court granted the motion for appeal, but denied all his other motions. This appeal followed.

STATEMENT OF THE FACTS

This case arises out of a homicide by shooting that occurred on June 25, 2008, at a residence located on 6316 North Rampart Street in New Orleans. The residence was owned by Michael Miller. At the time of the homicide, the following four people were residing in the residence: Mr. Miller; Mr. Miller’s girlfriend, Nadah Raymond; the murder victim, Victor Russell; and Mr. Russell’s girlfriend, CC McCollum (whose nick name is “JuC”). The victim’s sister, Jonell Chaneau, testified that the victim always struggled with addiction. She indicated that the victim had been living with JuC and Mr. Miller on Rampart Street, but she did not know Mr. Miler’s girlfriend, Ms. Raymond. Ms. Chaneau also indicated that she had heard that JuC was married. As noted below, Ms. Raymond testified that JuC was married to the defendant, Mr. Williams (whose nick name is “Gee”).
Michael Miller testified that he and Ms. Raymond, whom he knew for two months, were living in his house on the date of the homicide. He also was allowing Mr. Russell, the victim, and JuC to live in his house. According to Mr. Miller, Mr. Russell and JuC stayed at the house some nights, not all nights; and Mr. Russell and JuC were using drugs together. Mr. Miller did not know Mr. Williams (Gee); | (¡however, he acknowledged that he had seen Gee twice. One night when Mr. Miller arrived home from work, Gee pulled up and asked to speak to JuC. Mr. Miller called JuC, and she went out to talk to Gee.
*1205 On the day of the homicide, Mr. Miller arrived home after stopping for food. Ms. Raymond was on the corner of St. Maurice and Rampart screaming hysterically about gunshots; she could not tell him what had happened. A lady named Lela told him that Mr. Russell had been shot. When Mr. Miller went inside his house, he found Mr. Russell partially lying on his bed; his feet were on the floor. Mr. Miller exited the house and called 911. He admitted that he had an open criminal ease, which was the result of a recent arrest.
Nadah Raymond testified that she had problems with drugs, and her drug of choice was crack cocaine. She admitted that she had a conviction for possession of crack cocaine in the late 1990’s. She indicated that in June 2008 she was living in Mr. Miller’s house on North Rampart with Mr. Williams, Mr. Russell, and JuC. They were all using drugs in the house. She testified that Gee (Mr. Williams) and JuC were married. About a month or two before the shooting, Gee starting showing up at the house. JuC talked to him and braided his hair.
On the date of the homicide, Ms. Raymond did not recall smoking crack, but she had a couple of beers. At about 1:00 a.m. (shortly after midnight), she was walking to the house to go to the bathroom when Gee pulled up in his car. Gee called to her, and she walked over to his ear. He asked her if JuC was inside. She noted that he had a four door, black car and that he was driving on Tricou Street sheading toward St. Claude Avenue. She did not recall whether he was the driver or the passenger, and she did not recall what she told the police officers. She recalled that another person was in the car with Gee, but she did not get a good look at the other person. She also recalled that Gee was wearing red and white tennis shoes, khaki pants, and a black-hooded sweatshirt. The hood was off because she could see his braids. After she spoke to Gee, he drove off.
Ms. Raymond testified that after Gee drove off she ran inside to use the bathroom; it was that time of the month. (She was on her menstrual cycle). As she went up the steps of the house, she saw Mr. Russell and Linda exit Derrick’s white truck. (Derrick and Linda apparently had gone out with Mr. Russell.) Mr. Russell entered the house. From inside the bathroom Ms. Raymond asked Mr. Russell to lock the door. He replied that he was not going to lock it because Linda had not yet entered the house. Because there was no light in the bathroom, Ms. Raymond cracked the door to let some light inside. Ms. Raymond testified that she heard one shot, and she jumped up. Ms. Raymond further testified that when she ran out the bathroom door she saw “somebody standing over him [Mr. Russell] with a black hood and some khaki pants.” She recognized both the person’s voice and the person’s clothes. The person (the shooter) was wearing the clothes that Gee had been wearing in his car earlier. The shooter had the hood up on his head, and he was wearing “red tennis on the back.” She indicated that it had been no more than ten or fifteen minutes since she had seen Gee in those same clothes in his car. Ms. Raymond stated that she recognized the shooter’s voice as Gee’s voice because she | ahad just talked to him. She testified that Gee said to Mr. Russell (she assumed it was Mr. Russell): “You are going to stop playing with her, stop doing that to her.” Gee was not speaking to her; she was running out the door. She did not know whether Gee saw her exiting the house. She heard additional shots, but she did not know how many shots in total were fired.
When Ms. Raymond was outside the house, she ran to the corner where she *1206 saw Linda walking toward St. Claude Avenue. She also saw Mr. Miller walking up Rampart Street with a bicycle. Ms. Raymond told Mr. Miller that she had heard gunshots in the house. He ran inside the house and called 911. Ms. Raymond had already called 911 from a neighbor’s house. She testified that witnessing the murder had impacted her and that she no longer used drugs.
Ms. Raymond was able to give the officers Gee’s cell phone number. She explained that she had written the number on a blank page in the back of her Bible. She identified the photographic lineup that she signed and dated at 9:80 a.m. on June 25, 2008, the date of the homicide, identifying Gee (Mr. Williams) as the shooter. She also identified Mr. Williams in court. She had no doubt that the man she saw in the car (Gee) was the man she saw standing over Mr. Russell.[2]
Ic,On the day of the homicide, a 911 call was received at 3 a.m. reporting the incident. The first call indicated that a man had been shot; the call back indicated that a man had been shot in the head outside that location. The NOPD Homicide unit was notified.[3]
Homicide Detective Regina Williams, who was the lead detective on the case, testified that she went to the crime scene — Mr. Miller’s house on North Rampart Street. She observed that the house appeared to be under renovation. When she entered a bedroom, she observed the victim’s body partially on the floor near the bed. She also observed a blood trail leading to a bathroom. She interviewed Mr. Miller and Ms. Raymond; she was unable to interview JuC because she was deceased.[4]
Ms. Raymond provided Detective Williams with a clothing description of the shooter; she described the shooter as wearing a black hooded sweatshirt, khaki pants, and red and white tennis shoes. Detective Williams never obtained a search warrant to look for that clothing at Mr. Williams’s residence because she unable to develop a permanent address for him. Ms. Raymond also provided Detective Williams with Mr. Williams’ (Gee’s) cell phone number. Another detective confirmed that Mr. Williams was the cellular subscriber’s for that number. Detective Williams obtained a photograph of Mr. Williams and compiled a 17photographic lineup. Ms. Raymond, who did not appear *1207 to be under the influence of drugs or alcohol, picked out Mr. Williams’s photograph as the shooter and signed the back after dating it. Detective Williams then obtained an arrest warrant for Mr. Williams on a second degree murder charge. Mr. Williams turned himself in.[5]
Dr. Richard Tracey, who performed the autopsy on the victim (Mr. Russell), testified that the toxicology report indicated the presence of cocaine and opium products. Dr. Tracey identified his diagram of the tracks of seven bullets that passed through Mr. Russell’s body. Dr. Tracey stated that the two wounds through the victim’s head were instantaneously fatal; he would have died within minutes after the chest wound. He found no powder burns, which indicated that the shooter was at least eighteen inches away from the victim; he explained that “[t]o leave powder or gun smoke deposits [the shooter] would have to be closer than 18 inches to the skin.”

ERRORS PATENT

A review of the record for errors patent reveals none.

DISCUSSION

ASSIGNMENTS OF ERROR NUMBER 1 AND 2
[sMr. Williams contends that the assistant district attorney during his opening statement made an improper reference to “other crimes” evidence and that the trial court erred in denying him a mandatory mistrial pursuant to La.C.Cr.P. art. 770.[6] In the alternative, he contends that the trial court erred in denying him a discretionary mistrial pursuant to La.C.Cr.P. art. 771(1)[7] because the assistant district attorney’s remark was prejudicial.
*1208 The assistant district attorney’s allegedly improper reference during his opening statement that prompted the motion for a mistrial was that:
“You will hear from Michael Miller who will tell you he was around the house. You will hear from Nadah, Michael’s girlfriend, who will tell you that he was in and around the house. You are not going to hear from JuC. JuC was murdered within the last six months.”
|aAt that point, defense counsel moved a mistrial, arguing: “It’s improper bringing that into a trial, Judge, the statements of other alleged crimes. And [sic] this is a murder trial.” The trial court overruled the objection and denied Mr. Williams’ motion for a mistrial.[8]
This court summarized the governing principles applicable to the issue presented in this case in State v. Lacoste, 04-1625, pp. 10-11 (La.App. 4 Cir. 2/16/05) 896 So.2d 1180, 1186-87, as follows:
A mistrial is warranted under La. C.Cr.P. art. 770 when certain remarks are considered so prejudicial and potentially damaging to a defendant’s rights that even a jury admonition cannot provide a cure. State v. Edwards, 97-1797, pp. 19-20 (La.7/2/99), 750 So.2d 893, 906 (citing State v. Johnson, 94-1379 (La.11/27/95), 664 So.2d 94). Potentially damaging remarks include direct or indirect references to another crime committed or alleged to have been committed by the defendant, unless that evidence is otherwise admissible. La.C.Cr.P. art. 770(2). The comment must be within earshot of the jury and must be made by a judge, district attorney, or other court official. Id. Comments must be viewed in light of the context in which they are made, and the comment must unmistakably point to evidence of another crime. Edwards, 97-1797 at p. 20, 750 So.2d at 906. In addition, the imputation must unambiguously point to the defendant, and the defendant bears the burden of proving that a mistrial is warranted. Id. If the elements of Article 770 have not been satisfied, the decision on the motion for mistrial is governed by La. C.Cr.P. art. 771, and whether a mistrial is warranted under the circumstances is within the sound discretion of the trial judge. Id.

Id.

hnAIthough La.C.Cr.P. art. 770 is couched in mandatory terms (providing *1209 that a mistrial “shall” be ordered), the jurisprudence has held that the admission of other crimes evidence is subject to harmless error analysis. State v. Johnson, 94-1379, pp. 16-17 (La.l 1/27/95), 664 So.2d 94, 101-02. As this court has noted, “[pjrosecutorial remarks or comments which fall outside the scope of proper argument are harmless unless the reviewing court is thoroughly convinced that the remarks inflamed the jury and contributed to the verdict.” State v. Ward, 94-0490, p. 17 (La.App. 4 Cir. 2/29/96), 670 So.2d 562, 570(eiting State v. Byrne, 483 So.2d 564 (La.1986); State v. Jarman, 445 So.2d 1184 (La.1984); State v. Williams, 575 So.2d 452 (La.App. 4th Cir.1991)).
In this case, we find, as the State contends, that the prosecutor’s references to the murder of JuC within six months before trial was not an unmistakable and unambiguous reference to another crime committed by Mr. Williams. Indeed, Mr. Williams concedes that the prosecutor was not directly accusing him of committing murdering JuC. Mr. Williams nonetheless argues that the State unmistakably implied that he murdered JuC out of jealousy while simultaneously eliminating a witness against him. In support of his contention that the prosecutor’s remark was an improper reference to another crime warranting a mistrial, Mr. William cites Ward, supra.
In the Ward case, this Court upheld the trial court’s decision denying a motion for a mistrial under La.C.Cr.P. arts. 770 and 771. Mr. Ward, one of the female co-defendants who was convicted of purse snatching, appealed arguing that h i the trial court erred by denying her motion for mistrial based on the prosecutor’s improper reference to another crime allegedly committed by her and the co-defendant. The victim’s husband, Mr. Lionel Augustine, identified the co-defendants as the women who accosted his wife outside their home and wrestled her purse from her. At the time of trial, Mr. Augustine was in the hospital and thus did not testify. During his rebuttal argument, the prosecutor stated:
“Look at poor Mr. Lionel Augustine. He makes an identification with Sergeant Taylor two weeks after the incident. He says, Yeah; that’s her. The hair looks right. Yeah; I saw her face, things like that, [sic] Six months later, we do motion hearings in his house. And his health has deteriorated. And his memory has faded. And he said on the tape: I can’t remember. I can’t remember. I know the hair. The hair looked right. Yeah; I signed the back of the photo. Nobody forced me to sign the back of the photo. Nobody pointed out who to sign behind. But I can’t remember today. And where is he today? Is he in court? Did he come in and testify? No. he’s in the hospital. Congratulations, ladies.”
Ward, 94-0490 at pp. 14-15, 670 So.2d at 569. In support of her motion for mistrial, Ms. Ward argued that the prosecutor improperly referred to the alleged commission of another crime of violence against Mr. Augustine — physically injuring him and causing his hospitalization so that he could not testify at trial. The trial court denied the motion for mistrial.
Affirming, this court found the trial court did not abuse its discretion in denying Mr. Ward’s motion for a mistrial under both La.C.Cr.P. arts. 770 and 771. As to Article 770, we reasoned that “[although the prosecutor may have exceeded the proper scope of rebuttal argument, his comment cannot reasonably be construed under the circumstances of this case as a reference, either direct or indirect, to the alleged commission of another offense.” Ward, 94-0490 at p. 16,112670 So.2d at 570.
*1210 As to Article 771, we found that Ms. Ward failed to show any prejudice and that “the prosecutor’s remark did not measurably jeopardize the fairness of the defendant’s trial.” Ward, 94-0490 at p. 17, 670 So.2d 570.
In finding Mr. Ward failed to establish prejudice, we noted that the jury was aware of Mr. Augustine’s poor health and that his wife (the purse snatching victim) testified that he had undergone a hip operation and was still at Touro Hospital. We further noted that Ms. Ward’s participation in the purse snatching offenses was established beyond a reasonable doubt through eyewitness testimony. The victim (Mrs. Augustine) identified Ms. Ward in a photographic lineup and at trial as the woman who took her purse. We thus held that “[i]n this light, the prosecutor’s comment did not substantially prejudice the defendant or contribute to the jury’s verdict of guilty on each of the three counts.” Ward, 94-0490, 670 So.2d at 571.
Mr. Williams argues that the “mitigating circumstances” this Court relied upon in Ward are absent here. He notes that the comment in Ward regarding the witness (Mr. Augustine) being in the hospital was held not to prejudice the defendant or contribute to the jury’s verdict of guilt because the State’s evidence was fairly overwhelming. In contrast, Mr. Williams contends that the State’s evidence against him was not fairly overwhelming. He points out that the State’s evidence consisted of the testimony of only one witness, Ms. Raymond. He further points out that Ms. Raymond acknowledged that she used crack cocaine, that she had consumed alcohol on the day of the homicide, and that she did not see the shooter’s face. Mr. Williams still further points out that he was on trial for murder, 11sand the prosecutor’s reference “improperly suggested” that he also murdered JuC to punish her for living with Mr. Russell and to prevent her from testifying against him at trial. He contends that the jury was never provided a reason to question “the State’s clear implication of Mr. Williams’s [sic] involvement in JuC’s murder.”
Mr. Williams’ reliance on Ward, supra, is misplaced. In this case, JuC, as the State points out, was not at the residence when the shooting occurred; hence, she was not a witness who beneficially could have testified against Mr. Williams. Moreover, each ease must be considered on its individual facts and circumstances; and the prosecutor’s remark “must be viewed in light of the context in which they are made.” Lacoste, supra. The prosecutor in his opening statement was not accusing Mr. Williams of JuC’s murder; rather, the prosecutor was setting out the factual background of the case and explaining why JuC would not be testifying. The prosecutor’s remark, as stated earlier, was not an unambiguous reference to another crime committed by Mr. Williams. Thus, the trial court was not required to grant a mandatory mistrial under La. C.Cr.P. art. 770.
Nor did the prosecutor’s remark measurably jeopardize the fairness of Mr. Williams’ trial so as to warrant granting a discretionary mistrial under La.C.Cr.P. art. 771(1). See Ward, 94-0490 at p. 17, 670 So.2d at 570. Mr. Williams did not request an admonition, and the trial court did not give one.
Even assuming, arguendo, that the trial court erred by denying a mistrial, the error was harmless. Mr. Williams has not shown that the prosecutor’s reference to JuC’s murder inflamed the jury and contributed to the verdict. Moreover, the J^record reflects there was sufficient evidence to convict Mr. Williams of Mr. Russell’s murder.
*1211 Although Ms. Raymond acknowledged a prior drug problem, she testified that on the date of the homicide she drank alcohol but did not use drugs. Ms. Raymond heard a gunshot when she was in the bathroom; Mr. Russell had entered the house shortly before she heard the gunshot. She immediately ran out the bathroom. As she was exiting the house, she saw the back of the shooter. She did not see the shooter’s face. The shooter was wearing khaki pants, a black hooded sweatshirt, and red and white tennis shoes; Gee was wearing the same clothes less than ten or fifteen minutes before when she saw him in his car outside the house. She recognized Gee’s voice when she heard him say to the victim: “You are going to stop playing with her, stop doing that to her.” Ms. Raymond was certain that it was Gee who shot Mr. Russell. Ms. Raymond’s testimony, which the jury heard, was sufficient to prove beyond a reasonable doubt that Mr. Williams shot Mr. Russell.
The trial court did not abuse its discretion in denying Mr. Williams’ motion for mistrial under La.C.Cr.P. art. 770 or 771. Neither of the assignments of error have merit.

DECREE

For the forgoing reasons, the defendant’s conviction and sentence are affirmed.
AFFIRMED

. State v. Williams, 10-1108 (La.App. 4 Cir. 8/10/10) (unpub.); and State v. Williams, 10-2066 (La.l 1/12/10), 49 So.3d 894.

.On redirect examination, Ms. Raymond explained that at the time of the homicide she was wearing Mr. Miller’s polo shirt that was several sizes too big for her. She further explained that the blood on her clothing was her blood, not Mr. Russell's blood. (As noted elsewhere, she was on her menstrual cycle.) According to Ms. Raymond, when she called 911, she told the operator that she had not seen the shooter's face. Nonetheless, she knew that Gee was the shooter because of his voice and his clothing and shoes. She had just spoken to Gee ten or fifteen minutes before the shooting. She previously had seen Gee "quite a few times.” On re-cross examination, Ms. Raymond said that she did not recall what she told the detective about the blood on her clothes. In response to defense counsel’s question of whether she told a detective that she did not know how she got the blood on her clothes, Ms. Raymond replied that she did not recall that.

. These facts were testified to by Cindy Woods, the New Orleans Police Department ("NOPD”) assistant police communication supervisor who supervises all 911 calls.

. At this juncture, defense counsel filed a motion for mistrial. As discussed elsewhere, a prior motion for mistrial on the same basis was made during opening statements. The basis for the motion was that the reference to JuC’s murder is alleged to be an improper reference to "other crimes” evidence. The trial court’s denial of the motion for mistrial is the basis for both of Mr. Williams’ assignment of errors on this appeal.

. When she was recalled by the defense, Detective Williams refreshed her memory by reviewing the supplemental report. She indicated that Mr. Williams’ address, 4216 Holleygrove Street, was found through his cell phone billing. She also indicated that immediately after the shooting Ms. Raymond told Detective Garcia that she did not know how she got blood on her clothes. Detective Williams explained that Ms. Raymond was hysterical at that time. In response to questions regarding the blood on Ms. Raymond’s clothes, Detective Williams explained that the drops of blood were on the inner part of Ms. Raymond's shoe and the inner part of her leg. Detective Williams further explained that it was not blood spatter.

. La.C.Cr.P. art. 770 provides:
Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
(1)Race, religion, color or national origin, if the remark or comment is not material and relevant and might create prejudice against the defendant in the mind of the jury:
(2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible;
(3) The failure of the defendant to testify in his own defense; or
(4) The refusal of the judge to direct a verdict.
An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial. If the defendant, however, requests that only an admonition be given, the court shall admonish the jury to disregard the remark or comment but shall not declare a mistrial.

.La.C.Cr.P. art. 771(1) provides:
In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:
(1) When the remark or comment is made by the judge, the district attorney, or a court official, and the remark is not within the scope of Article 770; or
[[Image here]]
*1208 In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial.

. As noted elsewhere, defense counsel filed another motion for mistrial during Detective Williams' testimony at trial. In response to the prosecutor's question who lived at the house, Detective Williams provided the names of the victim, Mr. Russell; the owner, Mr. Miller; Ms. Raymond; and a female whom she knew as JuC. The prosecutor then asked: "Do you know where JuC is today?” Counsel for Mr. Williams objected and stated: "[H]e is bordering on another objection for a mistrial.” Detective Williams testified that she interviewed two residents, Mr. Miller and Ms. Raymond. The prosecutor then asked: "Did you ever interview the third one?” Detective Williams replied: “No, I did not.” The prosecutor then asked: "Why not?” Counsel for Mr. Williams then stated: "Again, bordering on the same objection.” The trial court overruled the objection, and Detective Williams answered: “Could not find her.” Detective Williams answered affirmatively when asked if she attempted to find her [JuC]. Detective Williams answered negatively when she asked if she ever located JuC. The prosecutor then asked: "And [sic] are you still attempting to locate her?” Detective Williams replied: "No, I’m not.” The prosecutor asked: "Why not?” Counsel moved for a mistrial and declared: "This is the same stuff I talked about earlier.” The prosecutor and Mr. Williams's counsel approached the bench. Then the prosecutor asked if JuC was deceased, and Detective Williams answered affirmatively.