854 So.2d 945 (2003)
STATE of Louisiana
v.
Deidre Antoinette PIERRE.
No. 02-277.
Court of Appeal of Louisiana, Third Circuit.
June 11, 2003.
*946 Michael Harson, District Attorney, William T. Babin, Assistant District Attorney, Lafayette, LA, for State of Louisiana.
J. Wilson Rambo, Louisiana Appellate Project, Monroe, LA, for Defendant, Deidre A. Pierre.
Court composed of NED E. DOUCET, JR., Chief Judge, JIMMIE C. PETERS, and BILLY H. EZELL, Judges.
DOUCET, Chief Judge.
Defendant, Deidre Antoinette Pierre, was originally indicted on June 18, 1998, with one count of first degree murder in violation of La.R.S. 14:30 and one count of attempted first degree murder in violation of La.R.S. 14:27 and 14:30. On December 10, 1999, the indictment was amended to reduce the charges to one count of second degree murder in violation of La.R.S. 14:30.1 and one count attempted second degree murder, a violation of La.R.S. 14:27 and 14:30.1. Defendant pled not guilty and not guilty by reason of insanity. A bench trial commenced on September 10, 2001, and on September 11, 2001, Defendant was found guilty as charged on both counts. Defendant's motion for a new trial, filed December 6, 2001, was denied. Defendant waived the twenty-four-hour delay, and the trial court sentenced Defendant to life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence on the conviction for second degree murder and to ten years at hard labor without the benefit of parole, probation, or suspension of sentence on the conviction for attempted second degree murder, to be served consecutive to the life sentence. At the sentencing hearing, Defendant raised the issue of whether the sentences should be served concurrently or consecutively; however, Defendant did not file a written motion to reconsider the sentence.
On April 3, 2002, Defendant appealed her convictions and sentences with this *947 court alleging, among several other assignments, that Defendant was not informed of nor did she knowingly and intelligently waive her constitutional right to a jury trial. This court agreed, and on October 2, 2002, reversed and set aside the Defendant's convictions and sentences, remanded the case to the trial court for a new trial. On October 30, 2002, the State filed a writ application with the Supreme Court of Louisiana seeking a review of this court's judgment. On March 23, 2003, the supreme court found Defendant knowingly and intelligently waived her right to a jury trial, granted the State's application, and reinstated her conviction and sentence and remanded the matter back to this court to consider the Defendant's remaining claims. State v. Pierre, 02-2665 (La.3/28/03), 842 So.2d 321.

FACTS:
In the early evening of February 13, 1998, Defendant and her three-year-old son, Avante Pierre, entered her cousin's townhouse where Defendant's estranged husband, Anthony Pierre, and Defendant's mother, Lois Thomas, were helping the cousin move furniture. After a short conversation with her husband, Defendant produced a gun and shot him once in the head. She also shot their son in the head before she turned the gun on herself. Defendant and her husband survived the gunshot injuries. The son, however, died shortly thereafter in the emergency room of the hospital.

ERRORS PATENT:
In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by the court for errors patent on the face of the record. The record, reveals one patent error.
The Defendant was not informed of the two-year time limit for filing post-conviction relief as required by La.Code Crim.P. art. 930.8. Thus, the trial court is directed to inform the Defendant of the provisions of Article 930.8 by sending appropriate written notice to the Defendant within ten days of the rendition of this opinion and to file written proof that the Defendant received the notice in the record of the proceedings. See State v. Fontenot, 616 So.2d 1353 (La.App. 3 Cir.), writ denied, 623 So.2d 1334 (La.1993); State v. Courtney, 99-1700 (La.App. 3 Cir. 5/3/00), 761 So.2d 112.

ASSIGNMENT OF ERROR NO. 1:
As her first assignment of error, Defendant alleges the evidence was insufficient to sustain her convictions for second degree murder and attempted second degree murder. Citing State v. Silman, 95-0154 (La.11/27/95), 663 So.2d 27, Defendant argues whereas an affirmative defense of insanity was raised, the standard of review for sufficiency of the evidence is that this court must "determine whether under the facts and circumstances of the case, any rational fact finder, viewing the evidence most favorable to the prosecution, could conclude, beyond a reasonable doubt, that the defendant failed to prove by a preponderance of the evidence that she was insane at the time of the offense." Id. at 32.
In Louisiana, a legal presumption exists that a defendant is sane and responsible for his actions at the time of the offense. La.R.S. 15:432. To refute this presumption, the Defendant must establish by a preponderance of the evidence that at the time of the crimes she was incapable of distinguishing right from wrong. State v. Smith, 95-1171 (La.App. 3 Cir. 4/24/96), 677 So.2d 458.
The following facts were established at trial: On February 13, 1998, the Defendant and her husband of three years, Anthony Pierre, were estranged and had been living apart for approximately a *948 month and a half. Their three-year-old son, Avante Devonne Pierre, was living with the Defendant. At the time of the incident, Defendant was five and one-half months pregnant. On the day of the incident, Defendant was organizing a house in Opelousas just given to her by her father, Dewey Thomas.
At the same time, Defendant's mother, Lois Thomas, and Anthony Pierre were helping a cousin, Cedric Green, move out of his townhouse in Lafayette. At approximately seven o'clock in the evening, Defendant drove to Green's townhouse with her son. There, she entered the living room to speak with her husband. She handed him the boy and Pierre sat down with the boy on his lap. They had a short discussion which quickly grew into an argument. Defendant withdrew a gun from the waistband of her pants. At this point the testimony is somewhat confused. Mr. Green stated that he started toward the Defendant in an attempt to defuse the situation, but that his aunt, Ms. Thomas, grabbed him and told him to go next door and call the police. However, Ms. Thomas stated that she does not recall Mr. Green, who she claims was outside, starting toward the Defendant.
In any event, the Defendant shot Pierre, striking him on the side of the head. He staggered out of the townhouse. Green, who asking a neighbor to call the police, saw Pierre stagger from the apartment and went to his aid. He then heard two more shots. The Defendant shot the boy and then shot herself. Green stated that he ran into the apartment after the shooting stopped and kicked the gun away from Defendant's hand. Ms. Thomas denied this, and stated that she picked up the gun, put it in the trunk of her car, and later gave the gun to one of the investigating officers.
The appellate record reveals that all three were transported to Our Lady of Lourdes Regional Medical Center. The boy died within the hour. It was determined that Pierre's gunshot injury to his head was not life threatening and that the Defendant's injury to her head was not serious. After Defendant was released from the hospital later in the evening, she was arrested and taken to the Lafayette Police Department. On March 24, 1998, upon the determination of three physicians that the Defendant was suffering from a mental illness and could not assist in her defense, the trial court ordered Defendant incarcerated at the Feliciana Forensic Facility for treatment until such time it could be determined that she was competent to assist her counsel with her defense. In October 1999, Defendant was declared competent to assist her counsel and on January 11, 2000, Defendant was arraigned, at which time she pled not guilty and not guilty by reason of insanity.
Defendant argues in brief that "[i]t was clear from the testimony presented that Appellant did not have the specific intent to kill her son or Anthony. Clearly, she was a disturbed woman, who at the time of the offense, could not distinguish between right and wrong."
Anthony Pierre testified he had seen the Defendant earlier in the day of the incident when she called him from her house in Opelousas, around one or two o'clock in the afternoon, to bring something to eat for their son, which he did. He stayed for fifteen or twenty minutes because the Defendant had locked her car keys in the car and he attempted to get the door opened, but was unsuccessful. Later, around seven o'clock, she showed up at Green's townhouse. She handed him the boy and insisted on talking to him right then. She told him she wanted to "work things out." Pierre testified there was no argument and *949 he was surprised when she pulled out the gun.
A.... I turned one way, and then I turned back at her. And when I turned back the second or third time partially all the way to the right, that's when I just heard a big loud sound, boom. My left ear was ringing. I felt blood trickling on me. I fell over onto the floor forward.
Pierre testified that the Defendant had previously threatened him with a gun. He testified he purchased a gun for the Defendant because he worked offshore and wanted her to have protection during the periods he was gone. He stated that shortly after they separated she called him to come and pick up their son for the night. When he went to get the boy, he asked for the gun. At this time, she made tentative threats toward him, not actually pointing the gun at him, but holding it down and refusing to give it to him. Finally, she threw the gun on the floor and he retrieved it without further incident.
Cedric Green, a nephew of Defendant's mother, testified he had borrowed Thomas's truck and Thomas and Pierre were helping him move. Green testified that when the Defendant first arrived, she did not appear to be upset. He stated Defendant and Pierre began to talk, but "it kind of escalated from there." When he tried to interrupt, he was told by Defendant's mother to let them be. As he was attempting to maneuver a sofa through the front door, he saw Defendant pull out the gun and point it at Pierre. He dropped the couch, and at Thomas's direction, he ran next door to call the police. He then heard a shot and Pierre came staggering out the door of the townhouse. While he was helping Pierre, he heard more shots and Defendant's mother came running out crying, "She shot the baby." When he went inside to see, Defendant was laying on the floor next to the boy, stroking him.
Lois Thomas testified that she was standing outside when the Defendant first arrived at Green's townhouse. Defendant kissed her hello and tried to give the boy to her, but Thomas said she told her to take the boy inside because it was cold outside. At trial, Thomas stated that although she saw Defendant point the gun at Pierre, she did not see her point the gun at or shoot the boy. She said she backed out of the townhouse and when she reentered the Defendant had shot the boy and herself, at which time Thomas picked up the gun and put it into the trunk of her car. However, Thomas admitted she told the police on the evening of the shooting that she saw the Defendant point the gun at the boy and shoot him.
Lisa Carstens, a patrol officer with the Lafayette Police Department, testified that while in the hospital emergency room, the Defendant cried repeatedly, "What did I do? I shot my baby. I killed my baby."
Nicole White, a registered psychiatric nurse at Houston Northwest Medical Center in Houston, Texas, testified that she was a longtime friend of Anthony Pierre. She became friends with Defendant after the Defendant and Pierre began dating. She testified that, although she had a falling out with the couple several months prior to the shooting, Defendant had called her a week before the shooting and told her that unless Pierre did what she wanted him to do, she was going to kill him and "I'm going to kill my child, because I know he loves Avante."
Christopher Joseph, a former employer of Defendant, testified that three to five months before the incident the Defendant discussed her martial problems with him. She told him that "rather than letting him (Pierre) have his way, she would take him out."
*950 Dewey Thomas, Defendant's father, testified that the gun used to shoot Pierre and the boy was his gun. He had reported the gun missing to the police before the incident. He testified that he had told Defendant she could have the gun if she felt the need for protection, but he did not know she had taken the gun. Thomas testified Pierre came to the house on the morning of the incident to return the boy from an overnight visit. Thomas stated he saw the Defendant give Pierre back money he had given to her to get an abortion. Thomas said he heard the Defendant tell Pierre that she was not going to do what he wanted her to do. Thomas stated that when she left to go to her house, she was in a jolly mood. "She was calm spirit."
Defendant's sister, Devona Travis, testified that she saw the Defendant a few days prior to the shooting. She stated that Defendant was in a good mood and ready to get on with her life. Triston Thomas, Defendant's brother, testified that on the day of the shooting he saw Defendant at her house when she called him for assistance to get into her locked car. He took some food over for the boy then left to get the spare key for the car. He testified that when he returned, her mood had changed and she was worried about how she was going to take care of herself, the boy, and the unborn child.
Defendant admitted at trial that she took the gun without her father's knowledge. She stated she was carrying the gun on the day of the shooting because she was driving between Lafayette and Opelousas alone. When she arrived at Green's townhouse, she tucked the gun into the waistband of her pants. Defendant denied that she tried to hand the boy to her mother before she entered the townhouse. Defendant stated she went there to ask Pierre to cooperate with a divorce and that he refused and told her he was going to bring up her "mental issues." She stated that when she pulled out the gun she intended to shoot herself and she had no intent to harm Pierre, or her son. Defendant admitted she shot Pierre, but stated she could not remember shooting the boy. She denied ever telling Nicole White that she would kill Pierre and the boy and she denied telling Christopher Joseph that she would take out her husband. Defendant had no explanation why they would have made those statements.
Next, Defendant argues that she did not have the specific intent to kill her husband and son because of her mental state. The Defendant argues that at the time she shot her husband and son, she was incapable of distinguishing right from wrong. Defendant points to the statements made by the sanity commission appointed in March 1998, that Defendant was "unable to distinguish right from wrong or assist counsel in her defense." Defendant asserts that Doctors Gonzales, Cloyd, and Warner found that "less than a week" after the incident she was suffering from a major mental illness and unable to distinguish right from wrong. Dr. Diane Gonzalez initially met with Defendant on February 20, 1998, seven days after the offense. They met again on March 6th. Dr. William Cloyd and Dr. Mark Warner also evaluated Defendant in March. All three agreed that Defendant was suffering from a "major depressive disorder" and severe psychosis. Dr. Cloyd opined that her "present illness renders her unable to distinguish right from wrong or to assist counsel in her defense." Dr. Warner stated that her "presentation is consistent with an individual who has experienced acute, severe trauma." Following the recommendation of the March 1998 sanity commission, the court had Defendant institutionalized at The Feliciana Forensic Facility (now known as Eastern Louisiana *951 Mental Health System, but referred to, by us, as Feliciana).
The medical reports included in the record also establish that the Defendant had a history of mental illness dating back to junior high school. The records indicate that she was raped while a seventh grade student and the rape precipitated her mental problems. Her history includes contemplation of suicide by gunshot and attempted suicide by overdose of medication (unspecified). Her mental problems continued and in December of 1995 she was admitted to Vermilion Hospital with "Major Depression and Suicidal Ideations." She was discharged to the Center for Psychiatric and Addicted Medicine with a diagnosis of "Major Depression, Recurrent, Severe." The discharge also noted that she had family and marital problems and listed her prognosis as "fair with compliance of aftercare planning and follow-up."
However, inasmuch as none of these reports were introduced at trial we are estopped from considering them.
The record indicates that Defendant was found competent to proceed to trial after a year at Feliciana. The trial was postponed several times so that Defendant could be evaluated as to whether she was able to distinguish right from wrong at the time of the shootings. The record reflects the State and the defense entered into the following stipulation:
We would stipulate that the State would call Thomas Frane, Ph.D., a psychologist, whose address is in Baton Rouge, Louisiana, who would be qualified as an expert in clinical and forensic psychology, and who would testify that he has reviewed all of the mental health records of the defendant, the police reports in this matter, and specifically the evaluation rendered by Dr. Mark Warner, the defense expert, on July 23rd, 2001; and he would testify that he, after that review, would concur with the opinion of Dr. Warner, that at the time of the commission of the offense, this defendant could distinguish between right and wrong as to the conduct in question.
The record does not contain the report of Dr. Warner referred to in the stipulation. Further, defense counsel neither called any medical witnesses nor introduced any medical evidence at trial.
Considering the stipulation and the lack of any medical testimony or evidence introduced on behalf of the Defendant, there is nothing in the record to show that the Defendant was incapable of distinguishing right from wrong at the time of the shooting. Thus, Defendant failed to prove by a preponderance of the evidence that she was unable to distinguish right from wrong at the time of the shootings. Accordingly, this portion of her assignment of error is without merit.
La.R.S. 14:30.1 provides that second degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. An attempt is defined as:
Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.
La.R.S. 14:27(A). La.R.S. 14:10 defines specific intent as:
(1) Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.
*952 Under the Jackson standard the State was required to prove beyond a reasonable doubt that Defendant possessed the requisite intent to kill her husband and son at the time she entered the townhouse with the gun hidden in her waistband. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Defendant was charged with one count of second degree murder of her son and one count of attempted second degree murder of her husband.
To establish attempted second degree murder the State must have proved beyond a reasonable doubt that the Defendant specifically intended to kill her husband and that she committed an "act for the purpose of and tending directly toward the accomplishing of" that intent. Specific intent to commit great bodily harm is not enough. State v. Williams, 95-879 (La. App. 3 Cir. 1/31/96), 670 So.2d 414.
Although Defendant testified that she did not intend to harm either her husband or son, Defendant admitted she took her father's gun without his knowledge. The Defendant admitted she placed the boy into Pierre's arms then pulled the gun out and pointed it at Pierre. She admitted she shot her husband. Thomas and Green saw her point the gun at Pierre. Although Thomas testified otherwise at trial, she admitted she told the police on the night of the shooting that she saw the Defendant point the gun and shoot the boy. The act of aiming a firearm directly at a victim is indicative of an intent to kill the victim. State v. Clark, 93-1470 (La.App. 3 Cir. 10/5/94), 643 So.2d 463, writ denied, 94-2715 (La.1/9/95), 649 So.2d 418. Therefore, Defendant's specific intent can be inferred by her actions of aiming a weapon directly at her victims. Also, Defendant's earlier statements to her former employer and friend support a finding of her specific intent to kill both her estranged husband and her son.
Accordingly, we find the State proved all the elements of the crimes for which Defendant was convicted beyond a reasonable doubt. Thus, this assignment lacks merit.

ASSIGNMENT OF ERROR NO. 2:
For her second assignment of error, Defendant alleges the trial court erred when it denied her motion for a new trial. However, Defendant does not brief the assignment. Therefore, pursuant to Uniform-Rules Courts of Appeal, Rule 2-12.4, we consider this assignment abandoned.

ASSIGNMENT OF ERROR NOS. 4-6:
Defendant's last three assignments of error pertain to her sentences. The Defendant alleges that the trial court erred in failing to order a pre-sentence investigation report, that the trial court erred in imposing unduly harsh and excessive sentences, and that the trial court failed to articulate for the record those considerations taken into account and the factual basis in imposing the sentences, and failed to adequately consider and give appropriate weight to those mitigating circumstances present in her situation in contravention of the requirements of La. Code Crim.P. art. 894.1.
Following the sentencing hearing, Defendant objected to the sentences being ordered to be served consecutively, but raised no other grounds for a reconsideration. Although it was stated on the record Defendant would file a written motion for reconsideration, Defendant did not do so. La.Code Crim.P. art. 881.1 provides in part as follows:
D. Failure to make or file a motion to reconsider sentence or to include a specific ground upon which a motion to reconsider sentence may be based, including a claim of excessiveness, shall *953 preclude the state or the defendant from raising an objection to the sentence or from urging any ground not raised in the motion on appeal or review.
Defendant failed to make or file any additional ground for reconsideration; therefore, we will limit our review to whether the trial court erred when it imposed consecutive sentences. See State v. Moore, 98-1423 (La.App. 3 Cir. 3/3/99), 734 So.2d 706 and State v. King, 95-344 (La. App. 3 Cir. 10/4/95), 663 So.2d 307, writ denied, 95-2664 (La.3/15/96), 669 So.2d 433.
Defendant was convicted of second degree murder, for which she was sentenced to life imprisonment, and attempted second degree murder, for which she received a prison term of ten years at hard labor. La.R.S. 14:30.1, in pertinent part, provides:
B. Whoever commits the crime of second degree murder shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.
La.R.S. 14:27, in pertinent part, provides:
(1) If the offense so attempted is punishable by death or life imprisonment, he shall be imprisoned at hard labor for not less than ten nor more than fifty years without benefit of parole, probation, or suspension of sentence;
Defendant received the mandatory sentence for second degree murder and the mandatory minimum sentence for attempted second degree murder. Defendant was also ordered to serve the sentences consecutively.
Defendant argues in brief that she received consecutive sentences for offenses arising from a single course of conduct and that the record:
fails to contain the required articulation by the Honorable Trial Judge of particular justification for the imposition of consecutive sentences under these circumstances. (Cites omitted) Since no adequate compliance with Article 894.1 occurred, this court is without the information necessary to justify these apparently severe or excessive sentences.
La.Code Crim.P. art. 883, in pertinent part, provides:
If the defendant is convicted of two or more offenses based on the same act or transaction, or constituting parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively.
At sentencing, the trial court stated for the record:
THE COURT: Okay. The trial of this matter was concluded on September 11th 2001, which was kind of significant day for other reasons. I'm sure it's very, very significant for Ms. Pierre. Of course, one of thethe defendant was found guilty of second degree murder and attempted second degree murder. The court had ordered a pre-sentence investigation. Of course, especially relative to the second degree murder, it's rather pointless because we're dealing with a mandatory sentence in that matter.
....
There are no options. That is the sentence. And, accordingly, on the second degree murder, that is the sentence that the Court will impose. On the attempted second degree murder, the Statute provides that whoever commits an attempt where the offense so attempted is punishable by death or life imprisonment, which is the way this particular statute is defined, second degree murder is punishable by life in imprisonment. And, accordingly, the penalty prescribed for that particular offense is that that *954 person shall be imprisoned at hard labor for not less than ten (10) nor more than fifty (50) years, without benefit of parole, probation, or suspension of sentence.
Do you wish to present anything on the sentencing on the attempt?
MR. THIBODEAUX: No, Your Honor.
THE COURT: Attempted second degree murder. On the attempted second degree murder, the Court will order defendant to serve a sentence of ten (10) years hard labor, without benefit of probation, parole, or suspension of sentence, to run consecutive with the sentence on the second degree murder.
This court has held that when the trial court has no discretion to deviate from a legislatively mandated sentence, failure to articulate reasons as generally required by La.Code Crim.P. art. 894.1 is not an error since it would be futile to do so at sentencing, unless the sentences are constitutionally excessive. State v. Williams, 445 So.2d 1264 (La.App. 3 Cir.), writ denied, 449 So.2d 1346 (La.1984) and State v. Dorthey, 623 So.2d 1276 (La.1993). See also, State v. Armstrong, 32,279 (La.App. 2 Cir. 9/22/99); 743 So.2d 284, writ denied, 99-3151 (La.4/7/00), 759 So.2d 92.
In a case such as the instant case, where one of the sentences was a mandatory sentence and the other a mandatory minimum sentence, the Defendant has the burden to rebut the presumption that the sentences are unconstitutional by clear and convincing evidence, showing that:
[she] is exceptional, which in this context means that because of unusual circumstances this defendant is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstance of the case.
State v. Young, 94-1636, pp. 5-6 (La.App. 4 Cir. 10/26/95), 663 So.2d 525, 531, writ denied, 95-3010 (La.3/22/96), 669 So.2d 1223.
Defendant has failed to meet her burden of showing how she is exceptional under the circumstances. Except for reciting the law regarding the general requirements for an adequate sentencing procedure, Defendant does not give any reason why her consecutive sentences are excessive.
Furthermore, even though the shootings of her husband and son arose out of the same act, it is not mandatory that the sentences be served concurrently. In State v. Bibb, 626 So.2d 913 (La.App. 5 Cir.1993), writ denied, 93-3127 (La.9/16/94), 642 So.2d 188, the defendant killed his two children. The court affirmed the two consecutive life sentences. The court noted:
Herein, the two murders, though occurring close in time and place, are separate and distinct acts that justify consecutive sentences. Further, even assuming that the murders were close enough in time and place to be considered "same act" crimes which arise from a single course of conduct, we find that the trial court did not err in imposing consecutive sentences. Article 883 permits the court to impose consecutive sentences if the court "expressly directs" such sentences.
Id. at 940.
Thus we find the trial court did not err when it ordered the sentences to be served consecutively.
Accordingly, these assignments have no merit.

DISPOSITION
For the reasons stated above, Defendant's convictions and sentences are affirmed. The trial court is directed to inform the Defendant of the provisions of *955 Article 930.8 by sending appropriate written notice to the Defendant within ten days of the rendition of this opinion and to file written proof that the Defendant received the notice in the record of the proceedings.
AFFIRMED WITH INSTRUCTIONS.