# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 14-835

**STATE OF LOUISIANA**

**VERSUS**

**DAVID CALEB FONTENOT**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 21580-11
HONORABLE DAVID KENT SAVOIE, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## SHANNON J. GREMILLION
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Sylvia R. Cooks, Elizabeth A. Pickett, and Shannon J. Gremillion, Judges.

**CONVICTIONS AND SENTENCES AFFIRMED.**

**John F. DeRosier, District Attorney**
**Fourteenth Judicial District Court**
**Carla S. Sigler**
**Karen C. McLellan**
**Assistant District Attorneys**
**P. O. Box 3206**
**Lake Charles, LA 70602-3206**
**(337) 437-3400**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**Edward K. Bauman**
**Louisiana Appellate Project**
**P. O. Box 1641**
**Lake Charles, LA 70602-1641**
**(337) 491-0570**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **David Caleb Fontenot**

**David Caleb Fontenot**
**Louisiana State Penitentiary**
**General Delivery**
**Angola, LA 70712**
**PRO SE**

**GREMILLION, Judge.**

On April 13, 2011, Defendant, David Caleb Fontenot, fired a handgun at Stephin Bergeron and Bergeron's mother's fiancée, Chance Bourgeois, from the cab of a truck. Twenty-year-old Bergeron was shot three times and died as a result of his wounds.

Defendant was charged with second degree murder, a violation of La.R.S. 14:30.1, and attempted second degree murder, violations of La.R.S. 14:27 and 14:30.1. A jury trial commenced, following which Defendant was found guilty as charged. Defendant was sentenced to life imprisonment without the possibility of parole, probation, or suspension of sentence on the conviction for second degree murder and fifty years without the possibility of parole, probation, or suspension of sentence on the conviction for attempted second degree murder, to be served concurrently with the life sentence.

Defendant has perfected a timely appeal, alleging one attorney-filed assignment of error and three pro se assignments of error. We affirm Defendant's convictions and sentences.

## SUFFICIENCY OF THE EVIDENCE

Defendant argues that the evidence was insufficient to sustain the verdicts of second degree murder and attempted second degree murder. In the alternative, Defendant argues that the jury should have found him guilty of manslaughter and attempted manslaughter.

This court has stated that sufficiency of the evidence questions are considered using the following standard of review:

> [A] reviewing court must consider the evidence presented in the light
> most favorable to the prosecution and consider whether a rational trier
> of fact could have concluded that the essential elements of the offense

were proven beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The reviewing court defers to rational credibility and evidentiary determinations of the trier of fact. *State v. Marcantel*, 00-1629 (La.4/3/02), 815 So.2d 50.

*State v. Chesson*, 03-606, p. 5 (La.App. 3 Cir. 10/1/03), 856 So.2d 166, 172, *writ denied,* 03-2913 (La. 2/13/04), 867 So.2d 686. Furthermore, in *State v. Williams*, 13-497, pp. 4-5 (La.App. 3 Cir. 11/6/13), 124 So.3d 1236, 1240, *writ denied*, 13-2774 (La. 5/16/14), 139 So.3d 1024, this court noted:

> "Evidence may be either direct or circumstantial." *State v. Jacobs,* 07-887, p. 12 (La.App. 5 Cir. 5/24/11), 67 So.3d 535, 551, *writ denied,* 11-1753 (La.2/10/12), 80 So.3d 468, *cert. denied*, ___U.S. ___, 133 S.Ct. 139, 184 L.Ed.2d 67 (2012). We note that, whether the conviction is based on direct evidence or solely on circumstantial evidence, the review is the same under the *Jackson v. Virginia* standard. *State v. Williams*, 33,881 (La.App. 2 Cir. 9/27/00), 768 So.2d 728 (citing *State v. Sutton,* 436 So.2d 471 (La.1983)), *writ denied,* 00-99 (La.10/5/01), 798 So.2d 963. Circumstantial evidence is that where the main fact can be inferred, using reason and common experience, from proof of collateral facts and circumstances. *Id.* Where the conviction is based on circumstantial evidence, in order to convict, "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." La.R.S. 15:438.

> In *State v. Chism,* 436 So.2d 464, 469 (La.1983) (citations omitted), the supreme court discussed the use of circumstantial evidence, stating:

>> Circumstantial evidence involves, in addition to the assertion of witnesses as to what they have observed, a process of reasoning, or inference by which a conclusion is drawn. Like all other evidence, it may be strong or weak; it may be so unconvincing as to be quite worthless, or it may be irresistible and overwhelming. There is still no man who would not accept dog tracks in the mud against the sworn testimony of a hundred eye-witnesses that no dog passed by. The gist of circumstantial evidence, and the key to it, is the inference, or process of reasoning by which the conclusion is reached. This must be based on the evidence given, together with a sufficient background of human experience to justify the conclusion.

Consequently, before a trier of fact can decide the ultimate question of whether a reasonable hypothesis of innocence exists in a criminal case based crucially on circumstantial evidence, a number of preliminary findings must be made. In addition to assessing the circumstantial evidence in light of the direct evidence, and vice versa, the trier of fact must decide what reasonable inferences may be drawn from the circumstantial evidence, the manner in which competing inferences should be resolved, reconciled or compromised; and the weight and effect to be given to each permissible inference. From facts found from direct evidence and inferred from circumstantial evidence, the trier of fact should proceed, keeping in mind the relative strength and weakness of each inference and finding, to decide the ultimate question of whether this body of preliminary facts excludes every reasonable hypothesis of innocence.

Second degree murder is the killing of a human being "[w]hen the offender has a specific intent to kill or to inflict great bodily harm[.]" La.R.S. 14:30.1(A)(1). Attempt is defined as:

A. Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.

La.R.S. 14:27.

Toys O'Neil of Ville Platte testified that he knew Defendant when they were youngsters. In March 2011, he became reacquainted with Defendant. He testified that on one occasion in March 2011, Defendant stopped by his house, and they went to Academy Sports + Outdoors in Lafayette so that O'Neil could purchase a gun. O'Neil identified the gun the State showed him as the gun he had purchased, a Smith and Wesson .40 caliber semiautomatic handgun. The State showed the jury a video obtained from Academy Sports + Outdoors showing O'Neil and Defendant purchasing the weapon and the application O'Neil had filled out to

3

purchase a weapon. O'Neil testified that after he purchased the hand gun, along with bullets and two clips, he put the gun, bullets, and clips under the seat of his vehicle and never saw the gun again.

Reesa Boudreaux testified that her brother, Devin Badon, who was eighteen at the time and also charged in the incident, was living behind her house in March 2011, in a small garage apartment. She stated one of the conditions for his living there was that no one was to stay overnight with him without her permission. She testified that a few weeks prior to the shooting incident, at about 10:30 p.m., she heard Badon's white Ford truck, which she said was very loud, pull into the driveway. She watched him enter the garage with someone else who carried a duffle bag. She said they then left in Badon's truck. She did not know who was with her brother, but he left without the duffle bag. She testified that she and her husband went into the apartment, and, as they carried the duffle bag into the house, they could see bullets in a mesh pocket on the outside of the bag. She said that, when she finally reached her brother, she told him that he could no longer live there and to come and fetch the duffle bag. Shortly thereafter, Badon's girlfriend, Nikita Julian, and a friend, Kenny Kellum, came to get the bag. They looked through the bag and found a handgun and paperwork that named Defendant. Boudreaux told Kellum and Julian to tell her brother not to come back. Boudreaux later learned her brother and Defendant had moved to some place down the road on Myles Street in Carlyss.

Kellum testified that Badon's sister had put the bullets and two magazines in a sock but left the gun in the duffle bag. She instructed him to throw the sock away. He said he tossed the sock into the bayou under the Choupique Bridge. He testified that he then drove Defendant to his cousin's house in Lake Charles, but

4

Defendant came back to Carlyss shortly thereafter and stayed on Myles Street with Badon. Kellum also testified that in the afternoon of April 13, 2011, the day the victim was killed, he saw Defendant with Badon and Julian. Defendant was driving Badon's white Ford truck, and Badon was driving Julian's maroon Chevy truck.

Jennifer Guillory, a friend of Bergeron, testified that on April 13, 2011, at about 5:30 p.m., she went to Bergeron's mother's house, where Bergeron was at the time, and told him that a former girlfriend, Breanna LeDoux, was doing drugs with Badon and Defendant. Guillory said that Bergeron became very upset and called Badon to tell him to stay away from LeDoux. Guillory said an argument ensued, and they agreed to meet some place to fight. She said that the two had fought before but always came out of it friends. Chance Bourgeois, Bergeron's mother's boyfriend, left with Bergeron in his truck to meet Badon. Guillory said that the two came back about thirty to forty-five minutes later. Guillory stayed there until about 8:00 p.m., and nothing more untoward happened.

Christina Bergeron, Stephin Bergeron's mother, testified she overheard the conversation between her son and Badon. She also talked to Badon and told him she was going to tell his family that he was getting involved with drugs. She testified that later in the evening, as her son was getting ready to go home to his newly-rented apartment, two trucks showed up in front of the house, a white Ford and a maroon Chevy, revving their motors. Apparently Badon's truck had "cut off" pipes and was very noisy. Christina knew the white truck belonged to Badon. She said she waved at the two trucks and yelled that she was going to call the police. The trucks roared down the street. She went into the bathroom, and when she came out, although he had left his truck keys and phone, her son was gone.

5

Her boyfriend was also gone. Her daughter told her that the two had walked down the road to where the two trucks could still be heard revving their motors. Christina started to follow the two men when she heard shots. Her daughter came down the street in a van, and they drove to the main roadway. She found Bourgeois with her son, who was lying in a ditch.

Bourgeois had gone with Bergeron earlier in the day when he was to meet up with Badon. Bourgeois stated that he and Bergeron first passed Defendant driving Badon's truck. He did not know who Defendant was then. They then ran into Badon who was driving a maroon Chevy truck with Julian in the passenger seat. When the maroon truck came to a stop light, Bourgeois got out and pounded on the passenger's side door. However, Badon took off when the light changed and turned onto Interstate 10. Bourgeois said he thought it was over with. Later in the evening, however, the two trucks showed up at Christina's house, revving their motors. After the two trucks tore off, he could hear them at the end of the street.

Bourgeois started down the street, and Bergeron followed him. The two trucks were in the Wayne and Layne's Bar parking lot, more or less across the road from Jerry's Marine. The trucks were parked next to each other, facing in opposite directions. Bourgeois and Bergeron crossed the road. Bourgeois picked up a rock and threw it at one of the trucks. The trucks then drove rapidly out of the parking lot, the white Ford in the lead. Bourgeois stated he and the victim ran across the road to Jerry's Marine and jumped the ditch, thinking that the trucks might attempt to run them down. Then shots rang out. Bourgeois testified that bullets were whizzing by him. He said that he ran one way along Jerry Marine's fence line and thought that Bergeron had run the other way. After the two trucks drove away,

6

while calling 911, he came back to the road and discovered Bergeron in the ditch. He was shot in the head, through one eye, in the chest, and in the legs.

Julian testified she was with Badon the night of the shooting. They were in her maroon Chevy, and Defendant was driving the white Ford. She essentially related the day's events as described by Guillory, Christina Bergeron, and Bourgeois.

After the earlier confrontation, Julian texted Bergeron with the threat that they were going to stuff a gun down his throat. Julian testified that she, Defendant, and Badon drove first to Lake Charles, then to Wal-Mart, and Defendant attempted to purchase bullets for the gun but was refused because he was under age. Eventually, they got someone to purchase the bullets and magazines. The State produced security video from the sports department of Wal-Mart, which showed Defendant attempting to purchase bullets, and a receipt for the subsequent purchase.

Julian said, after Defendant received the bullets and magazines, they went to Bergeron's house where "[s]omeone came outside. They were waving their arms around hollering something and we drove off." She said that, after they left Bergeron's house, they were sitting in their trucks in Wayne and Layne's parking lot, when:

> From there we were parked in the parking lot of Wayne and Layne's and David [Defendant] and Devin [Badon] had a conversation of where they wanted to go to get cigarettes. And while that was happening rocks were being thrown at my truck. And I turned around to see who it was and I didn't see anybody. And then at that point David [Defendant] had took off a little bit and then out the window Devin [Badon] yelled at him, "There they are. Bust a cap in their ass. Bust a cap in their ass." And David [Fontenot] pulled off the road, pulled into a little side parking spot thing next to Jerry's Marine and pulled out as soon as we pulled in behind him, stopped dead in the middle of the road, and he shot at Stephin [Bergeron].

7

The State produced a video recording obtained from Jerry's Marine's security system showing a white truck, behind it a dark truck, and a man running down the fence line of the property. Several white flashes could be seen coming out of the passenger side window of the white truck before it sped away.

Julian testified that they went to where Defendant and Badon were staying in a shack behind someone's house. Shortly thereafter, Defendant left in Badon's truck. She and Badon went to bed, but, a little later, the police busted in and arrested them both. The Smith and Wesson semiautomatic handgun that was shown to O'Neil at the beginning of the trial was located in the field behind the shack.

Kellum, who lived in the same neighborhood as Defendant and Badon, was home with his two children. He stated that he heard the trucks that evening. He said he "heard them kill the truck, which was at Keith and them's house, because they was [sic] loud, and then I heard one start back up and come to my house and it was David Fontenot [Defendant]." Kellum stated it was around 10:00 p.m., and Defendant was in Badon's truck. Defendant pounded at his door. Kellum said he did not want to answer but did so because he was afraid the pounding would wake his children. Defendant told him he had been in a fight at a local bar and wanted to borrow his truck. As they were talking, vehicles began pulling up in front of his house. Defendant told him it was probably the police. Defendant left to go into the bathroom to wash his hands and asked to borrow a clean shirt. As more vehicles pulled up, Kellum went outside and was stopped by police with guns drawn. Defendant then came out of the house and was taken into custody without resistance.

Casings, bullets, and bullet fragments were collected from Badon's truck, from the area in front of Jerry's Marine, and from Bergeron's body. Darrell Pettefer testified that he located a couple bullet holes in the office building, and one of the boats outside had a bullet hole in it. He stated that he located a bullet inside the office building, which he turned over to the police. Charles Watson, Jr., an expert in firearm identification and ballistics with the Louisiana State Police Crime Laboratory, testified that, after examining the three casings found in the white truck, the two bullets extracted from Bergeron's body, and the bullet located inside Jerry's Marine building, he determined the bullets were fired from the gun found behind the shack where Defendant and Badon were staying at the time.

Finally, Defendant testified. He said he was totally unaware of the daylong dispute between Badon and Bergeron. After visiting his cousin in Lake Charles that day, Defendant, Badon, and Julian, in the two trucks, went to Wal-Mart to purchase bullets because Badon had wanted to go to Johnson Bayou to shoot the gun. He said he loaded the gun because Badon did not know how and put it into the glove compartment of Badon's truck. After they got back from Wal-Mart, Badon and Julian dropped him off at the shack. He said that Julian had to take her truck home for some reason, and Badon was going to bring her back. Defendant knew nothing more until Badon came back about thirty or forty-five minutes later and told him that he had shot "at one of them." Julian came in right after, all shook up. Defendant said that he decided to go out to a stripper bar, so he took the white Ford, but first stopped at Kellum's house to drop off some keys. He told Kellum that Badon wanted to borrow his truck.

Defendant testified that, earlier in the evening, as he was driving in the white Ford to visit his cousin in Lake Charles, Bourgeois and Bergeron tried to run him

9

off the road. He said that Bourgeois was leaning out the window yelling that he was going to kill him and whip his "f_ _ king ass," but he just laughed it off. He said that he began to suspect something was "fishy" when, after he could not purchase the bullets, Julian was going to call a friend whose father was a police officer and get her to steal some bullets. It was shortly after that when Badon received a phone call from Bergeron, and they argued. He said that Christina Bergeron even got on the phone and encouraged her son to fight with Badon, to "whoop his ass." Then a friend of Badon's showed up and purchased the bullets. As for the gun, he claimed that O'Neil agreed to buy him the gun because he was too young to purchase a weapon.

While there was no one who said they actually saw Defendant pull the trigger, the circumstantial evidence was so overwhelming that the jury was able to find Defendant guilty beyond a reasonable doubt of second degree murder and attempted second degree murder. Defendant brought the gun. There was ample eyewitness testimony that Defendant was driving Badon's truck all day and into the night, and he was in the truck by himself. Defendant attempted to purchase bullets for the gun, and, by his own testimony, once bullets were obtained, he loaded the gun and put it into the glove compartment of the truck he was driving. Julian testified that Defendant was in the white Ford truck and in possession of the gun when shots were fired and Bergeron was killed. The jury saw the security video taken from Jerry's Marine that showed shots being fired from the white truck.

The jury heard all of the testimony and obviously did not believe Defendant's version of events. The credibility of a witness is a matter of weight of the evidence, not sufficiency, and determination of the credibility is left to the

finder of fact's sound discretion and will not be re-weighed on appeal. *State v. F.B.A.*, 07-1526 (La.App. 3 Cir. 5/28/08), 983 So.2d 1006, *writ denied,* 08-1464 (La. 3/27/09), 5 So.3d 138.

Defendant alternatively argues that he did not have the requisite specific intent to commit second degree murder and attempted second degree murder, "and he should therefore be convicted of manslaughter." The manslaughter statute provides, in pertinent part:

> A. Manslaughter is:
>
> (1) A homicide which would be murder under wither Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed; or
>
> (2) A homicide committed, without any intent to cause death or great bodily harm.

La.R.S. 14:31.

Nothing presented at trial indicated that Defendant fired his weapon at the victims in sudden passion or heat of blood. Defendant denied even being on the scene at the time of the shooting and asserted that he was totally unaware of the argument between Bergeron and Badon. Certainly flinging a stone at a truck is not sufficient to rile someone's passion or heat their blood such that would mitigate murder to manslaughter.

Defendant further argues there was no showing that he intended to kill Bourgeois. Specific intent is a required factor to establish attempted manslaughter. *State v. Taylor,* 96-320 (La.App. 3 Cir. 11/6/96), 683 So.2d 1309, *writ denied,* 96-2828 (La. 6/20/97), 695 So.2d 1348. Defendant points out that three spent casings

were recovered from the white truck and three bullets were found. He argues that the victim was shot three times and three bullets were recovered; therefore, there was no indication that he shot at Bourgeois. However, the victim was shot three times while he stood in a ditch. Only two bullets were recovered from the victim's body. The third bullet was recovered from the building above and behind the victim. There were indications that more than three shots were fired. Pettefer testified he saw a couple of bullet holes in the building and saw another in one of the boats out in front of the building. Furthermore, Watson testified that he examined at least ten bullet fragments located in the area in front of Jerry's Marine.

As noted by Defendant, Christina Bergeron heard several shots. Bourgeois testified he heard bullets whizzing by him as he ran away along the fence line in front of Jerry's Marine. The evidence was sufficient for the jury to conclude that Defendant intended to kill Bourgeois. It is accepted jurisprudence that pointing a gun at a person and pulling the trigger indicates specific intent to cause serious bodily harm or death to that person. *State v. Pierre*, 02-277 (La.App. 3 Cir. 6/11/03), 854 So.2d 945, *writ denied,* 03-2042 (La. 1/16/04), 864 So.2d 626; *State v. Reed,* 00-1537 (La.App. 3 Cir. 3/6/02), 809 So.2d 1261, *writ denied,* 02-1313 (La. 4/25/03), 842 So.2d 391; *State v. Clark,* 93-1470 (La.App. 3 Cir. 10/5/94), 643 So.2d 463, *writ denied*, 94-2715 (La. 2/9/95), 649 So.2d 418. There is no merit to this assignment of error.

## PRO SE ASSIGNMENTS OF ERROR

## ERRORS ONE AND TWO

Defendant, for his pro se allegations of error, alleges primarily perjured testimony and prosecutorial misconduct for allowing testimony that the prosecutor knew was false. Defendant focuses on the inconsistencies between Bourgeois'

12

first statement given to the police on the night of the shooting and his testimony at trial. He asserts that in the first statement, Bourgeois told the police that he did not know who was in the trucks or from which truck the shots were fired. However, at trial, Bourgeois testified that he saw Defendant in the front, white truck and Badon in the second truck and that the gun shots came from the white truck. Defendant also alleges that the prosecutor allowed Andree Daugereaux, a detective with the Calcasieu Parish Sheriff's Office, who interviewed Bourgeois twice, to repeat Bourgeois' above testimony at trial, still knowing that the testimony was perjured.

While Bourgeois did not say so in either of the statements attached to Defendant's pro se brief, at trial, Detective Daugereaux testified that in a supplemental report she had noted that Bourgeois indicated there were two people in the maroon truck and one person in the white truck and the shots came from the white truck. Further, any inconsistencies between the written police statements and the trial testimony regarding the moments the two trucks bore down on the victims and shots were fired were pointed out to Bourgeois by the defense. Thus, the jury was aware of the inconsistencies. Finally, there was no indication the State allowed false testimony that went uncorrected. *See State v. Gordy*, 07-1032 (La.App. 3 Cir. 3/12/08), 981 So.2d 45.

### ERROR NUMBER THREE

In this assignment of error, Defendant argues several incidents of prosecutorial misconduct. First, he argues that during closing argument, the prosecutor told the jury that Pettefer and Detective Daugereaux each testified that when they viewed Jerry's Marine's actual security tapes that were later burned onto a CD, they could see one person in the front truck and two people in the

13

second truck. At the conclusion of the prosecutor's closing argument to the jury, he stated:

> Because we know this from Andree Daugereaux's testimony that Mr. Darrel Pettefer's testimony and Chance's testimony, and this is where we got in a little argument on the stand, this is where you can't take notes but you have to rely on your memory. Darrel Pettefer told us what he saw that night, as did Andree Daugereaux, as did Chance. What they did say -- forget names, okay. What they did say was -- Darrel said he saw the trucks, they came around, they paused for a minute. There were two people in the red or maroon truck and one person in the white truck and the shots came out of the passenger's side of the white truck. So forget the names. Three people. Andree Daugereaux, who saw the same videotape, three people. Chance Bourgeois, three people.

Defendant is correct in that, while he saw gun fire from the leading, white truck, Pettefer did not testify that he could see one person in the white truck and two people in the maroon truck in the security video. Neither did Detective Daugereaux testify that she could see one person in the front truck and two people in the second truck when she viewed the video, although she did testify she could see the gun fire coming from the white truck.

Regarding inappropriate comments during closing arguments, in *State v. Frost*, 97-1771, p. 19 (La. 12/1/98), 727 So.2d 417, 433, *cert. denied*, 528 U.S. 831, 120 S.Ct. 87, *superceded by statute on other grounds as stated in State v. Gomez*, 00-566 (La. 1/17/01), 778 So.2d 549, the supreme court stated as follows:

> This Court has recognized as a matter of well-settled law that the prosecutor has the right to "press upon the jury any view of the case arising out of the evidence—the Supreme Court is bound to credit jurors with common intelligence, conscientiousness, and sense of duty." *State v. Alexander*, 215 La. 245, 40 So.2d 232, 234 (La.1949). Even when we have found the prosecutor to have exceeded the proper bounds of argument, this Court has often criticized the improper arguments without finding that they constituted reversible error. *See, e.g.*[*State v.*] *Byrne,*[ 483 So.2d 564 (La.1986), *cert. denied,* 479 U.S. 871, 107 S.Ct. 243, (1986)] *supra*; *State v. Jarman,* 445 So.2d 1184 (La.1984); *State v. Messer,* 408 So.2d 1354 (La.1982). The standard by which this Court determines

14

whether improper closing argument constitutes reversible error is whether it is "firmly convinced that the jury was influenced by the remarks and that they contributed to the verdict." *State v. Sanders*, 93-0001 p. 16-17 (La.11/30/94), 648 So.2d 1272, 1285-86, *cert. denied*, 517 U.S. 1246, 116 S.Ct. 2504, 135 L.Ed.2d 194 (1996); *Byrne*, 483 So.2d at 572; *Messer,* 408 So.2d at 1357.

In the jury instruction, the trial court advised the jury that the State's and the defense's opening and closing arguments were not to be taken as evidence. Defendant himself pointed out during testimony that Pettefer did not state how many people were in which truck. Furthermore, we note that Defendant did not contemporaneously object to the statements made during closing argument and therefore waived any claim based on prosecutorial misconduct with respect to the statements. La.Code Crim.P. art. 841; *State v. Allen,* 12-1757 (La.App. 4 Cir. 10/9/13), 126 So.3d 675, *writ denied*, 13-2597 (La. 4/11/14), 137 So.3d 1214. Finally, as noted above, the evidence was overwhelming in this case. Even assuming that the prosecutor's statements were incorrect, Defendant has not shown that the statements contributed to the verdict.

Defendant also argues that the State withheld exculpatory evidence, such as phone records and text messages. However, it does not appear from the trial record that such evidence was withheld. The various witnesses discussed phone calls and text messages. Detective Daugereaux stated that she had reviewed the phone records of the Bergeron, Defendant, Badon, and Julian, and the calls to each other were consistent with the testimonies. There did not appear to be any issue concerning the phone calls. However, Defendant states in brief, "where Devin Badon made phone calls and text messages, that indicated him telling the victim/deceased that he Devin Badon had something for him later. And witnesses to support that fact, was [sic] not called to testify." Phone records can be obtained

15

by the defense. Moreover, Defendant does not indicate who would testify to the facts he claims were withheld or how the phone records were actually exculpatory.

Defendant also contends that some of his testimony regarding who was the shooter in this case was excluded from the transcript. He states that the State asked, "[S]o who was in the truck?" He answered that Badon was in the truck. The State then asked him who was the shooter, and he answered, "Devin Badon was the shooter." Defendant references a certain page of the trial transcript. We cannot locate this conversation at the cited page. Furthermore, there is no indication otherwise that portions of Defendant's testimony was excluded from the trial transcript. There is no merit to Defendant's three pro se assignments of error.

## DISPOSTION

Defendant's convictions for second degree murder of Stephin Bergeron and attempted second degree murder of Chance Bourgeois and the sentences imposed on each conviction are affirmed.

**CONVICTIONS AND SENTENCES AFFIRMED**.